[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13843

_____

D.C. Docket No. 9:08-cv-80736-KAM

In re: COURTNEY WILD,

Petitioner.

_____

On Petition for Writ of Mandamus to the United States District Court for the
Southern District of Florida

_____

(April 14, 2020)

Before NEWSOM, TJOFLAT, and HULL, Circuit Judges.

NEWSOM, Circuit Judge:

This case, which is before us on a petition for writ of mandamus, arises out

of a civil suit filed under the Crime Victims' Rights Act of 2004. Petitioner

Courtney Wild is one of more than 30 women—girls, really—who were victimized

by notorious sex trafficker and child abuser Jeffrey Epstein. In her petition, Ms.

Wild alleges that when federal prosecutors secretly negotiated and entered into a non-prosecution agreement with Epstein in 2007, they violated her rights under the CVRA—in particular, her rights to confer with the government's lawyers and to be treated fairly by them.

Despite our sympathy for Ms. Wild and others like her, who suffered unspeakable horror at Epstein's hands, only to be left in the dark—and, so it seems, affirmatively misled—by government lawyers, we find ourselves constrained to deny her petition. We hold that at least as matters currently stand—which is to say at least as the CVRA is currently written—rights under the Act do not attach until criminal proceedings have been initiated against a defendant, either by complaint, information, or indictment. Because the government never filed charges or otherwise commenced criminal proceedings against Epstein, the CVRA was never triggered. It's not a result we like, but it's the result we think the law requires.

## I

The facts underlying this case, as we understand them, are beyond scandalous—they tell a tale of national disgrace.

Over the course of eight years, between 1999 and 2007, well-heeled and well-connected financier Jeffrey Epstein and multiple coconspirators sexually abused more than 30 minor girls, including our petitioner, in Palm Beach, Florida and elsewhere in the United States and abroad. Epstein paid his employees to find

2

minor girls and deliver them to him—some as young as 14.  Once Epstein had the girls, he either sexually abused them himself, gave them over to be abused by others, or both.  Epstein, in turn, paid bounties to some of his victims to recruit other girls into his ring.

Following a tip in 2005, the Palm Beach Police Department and the FBI conducted a two-year investigation of Epstein's conduct.  After developing substantial incriminating evidence, the FBI referred the matter for prosecution to the United States Attorney's Office for the Southern District of Florida.  Beginning in January 2007, and over the course of the ensuing eight months, Epstein's defense team engaged in extensive negotiations with federal prosecutors in an effort to avoid indictment.  At the same time, prosecutors were corresponding with Epstein's known victims.  As early as March 2007, they sent letters advising each one that "as a victim and/or witness of a federal offense, you have a number of rights."  The letters, which the government distributed over the course of about six months, went on to enumerate the eight CVRA rights then in force—including, as particularly relevant here, "[t]he reasonable right to confer with the attorney for the [Government] in the case" and "the right to be treated with fairness and with respect for the victim's dignity and privacy."

By May 2007, government lawyers had completed both an 82-page prosecution memo and a 53-page draft indictment alleging that Epstein had

committed numerous federal sex crimes.  In July, Epstein's lawyers sent a detailed letter to prosecutors in an effort to convince them that, in fact, Epstein hadn't committed any federal offenses.  By September, the sides had exchanged multiple drafts of what would become an infamous non-prosecution agreement ("NPA").  Pursuant to their eventual agreement, Epstein would plead guilty in Florida court to two state prostitution offenses, and, in exchange, he and any coconspirators (at least four of whom have since been identified) would receive immunity from federal prosecution.[1]  In June 2008, Epstein pleaded guilty to the state crimes as agreed and was sentenced to 18 months' imprisonment, 12 months' home confinement, and lifetime sex-offender status.

The district court found that "[f]rom the time the FBI began investigating Epstein until September 24, 2007"—when the government formally executed the NPA with Epstein—federal prosecutors "never conferred with the victims about a[n] NPA or told the victims that such agreement was under consideration."  *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1208 (S.D. Fla. 2019).  Worse, it appears that prosecutors worked hand-in-hand with Epstein's lawyers—or at the very least

---

[1] The agreement also contained several provisions concerning Epstein's victims.  The government, for instance, agreed to provide a list of known victims to Epstein and, "in consultation with and subject to the good faith approval of Epstein's counsel," to "select an attorney representative" for the victims, to be "paid for by Epstein."  Epstein agreed not to contest liability or damages in a victim's civil suit, "so long as the identified individual elect[ed] to proceed exclusively under 18 U.S.C. § 2255, and agree[d] to waive any other claim for damages."  An odd set-up—and one that, it seems to us, was likely calculated to quickly and quietly resolve as many victim suits as possible.

acceded to their requests—to keep the NPA's existence and terms hidden from victims. The NPA itself provided that "[t]he parties anticipate that this agreement will not be made part of any public record" and, further, that "[i]f the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure." Moreover, at approximately the same time that the sides concluded the NPA, they began negotiating about what prosecutors could (and couldn't) tell victims about the agreement. Seemingly in deference to Epstein's lawyers' repeated requests, the government held off—for nearly an entire year—on notifying Epstein's victims of the NPA's existence.

And to be clear, the government's efforts seem to have graduated from passive nondisclosure to (or at least close to) active misrepresentation. In January 2008, for example, approximately four months after finalizing and executing the NPA, the government sent a letter to petitioner stating that Epstein's case was "currently under investigation," explaining that "[t]his can be a lengthy process," and "request[ing her] continued patience while [it] conduct[ed] a thorough investigation." The government sent an identical letter to another victim in May 2008, some *eight* months after inking the NPA.[2]

---

[2] The government contends that these letters were technically accurate because the already-signed NPA remained under review by senior members of the Department of Justice. *See* Br. in Opp. to Pet. at 4 n.1.

5

If secrecy was the goal, it appears to have been achieved—there is no indication that any of Epstein's victims were informed about the NPA or his state charges until after he pleaded guilty.  On the day that Epstein entered his guilty plea in June 2008, some (but by no means all) victims were notified that the federal investigation of Epstein had concluded.  But it wasn't until July 2008—during the course of this litigation—that petitioner learned of the NPA's existence, and until August 2008 that she finally obtained a copy of the agreement.

We are doubtlessly omitting many of the sad details of this shameful story. For our purposes, we needn't discuss the particulars of Epstein's crimes, or the fact that the national media essentially ignored for nearly a decade the jailing of a prominent financier for sex crimes against young girls.[3]  Today, the public facts of the case are well known—Epstein was eventually indicted on federal sex-trafficking charges in the Southern District of New York, and in August 2019, while awaiting trial, he was found dead in his jail cell of an apparent suicide.

## II

In July 2008, petitioner brought suit in the United States District Court for the Southern District of Florida, styling her initial filing an "Emergency Victim's

---

[3] *Cf.* David Folkenflick, *A Dead Cat, A Lawyer's Call And A 5-Figure Donation: How Media Fell Short on Epstein*, NATIONAL PUBLIC RADIO (Aug. 22, 2019, 6:06 PM), https://www.npr.org/2019/08/22/753390385/a-dead-cat-a-lawyers-call-and-a-5-figure-donation-how-media-fell-short-on-epstei.

Petition for Enforcement of Crime Victim's Rights Act." As the district court explained, "because no criminal case was pending" at the time—no federal charges having been filed against Epstein or anyone else—petitioner "filed [her] petition as a new matter . . . which the Clerk of Court docketed as a civil action." *Does v. United States*, 817 F. Supp. 2d 1337, 1341 n.4 (S.D. Fla. 2011). Petitioner alleged that she was a "crime victim" within the meaning of the CVRA and that by keeping her in the dark about their dealings with Epstein, federal prosecutors had violated her rights under the CVRA—in particular, her rights "to confer with the attorney for the Government in the case," 18 U.S.C. § 3771(a)(5), and "to be treated with fairness and with respect for [her] dignity and privacy," *id.* § 3771(a)(8).[4]

Over the course of the ensuing decade, the district court issued a number of significant rulings. For our purposes, three of the court's orders are particularly important.

Initially, in 2011 the district court "addresse[d] the threshold issue whether the CVRA attaches before the government brings formal charges against the defendant." *Does*, 817 F. Supp. 2d at 1341. The court held that "it does because the statutory language clearly contemplates pre-charge proceedings." *Id.* As

---

[4] A second petitioner joined the suit shortly after it was filed. For simplicity's sake—and to avoid confusion—we will refer to "petitioner's" suit, in the singular.

7

relevant here, the district court relied principally on two CVRA provisions in so holding. First, it pointed to 18 U.S.C. § 3771(c)(1), which the parties here have called the Act's "coverage" provision. That subsection—of which much more later—states that "[o]fficers and employees of the Department of Justice and other departments and agencies of the United States engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a)." The district court held that "[s]ubsection (c)(1)'s requirement that officials engaged in 'detection [or] investigation' afford victims the rights enumerated in subsection (a) surely contemplates pre-charge application of the CVRA." *Does*, 817 F. Supp. 2d at 1342. Second, the court pointed to subsection (d)(3), which the parties here call the "venue" provision and which states that a crime victim seeking to vindicate his or her rights under the CVRA must file a "motion" either "in the district court in which a defendant is being prosecuted or, if no prosecution is underway, in the district court in the district in which the crime occurred." If, the district court reasoned, "the CVRA's rights may be enforced before a prosecution is underway, then, to avoid a strained reading of the statute, those rights must attach before a complaint or indictment formally charges the defendant with the crime." *Does*, 817 F. Supp. 2d at 1342. Finally, the district court cited *In re Dean*, in which the Fifth Circuit had observed that "[a]t least in the posture of th[e] case" before it—

8

the court emphasized that it wasn't "speculat[ing] on the applicability to other situations"—the victim's right to confer with prosecutors applied pre-charge. 527 F.3d 391, 394 (5th Cir. 2008). Having "determined . . . as a matter of law [that] the CVRA can apply before formal charges are filed," the district court here "defer[red]" ruling on the question whether federal prosecutors had violated the Act until the parties could conduct additional discovery. *Does*, 817 F. Supp. 2d at 1343.

Following another eight years of litigation, the district court issued a pair of rulings that prompted the mandamus petition now before us. In February 2019, the court found that the government had infringed petitioner's CVRA rights. *See Doe 1*, 359 F. Supp. 3d at 1222. In particular, the court held that federal prosecutors violated the Act by "enter[ing] into a[n] NPA with Epstein without conferring with Petitioner[] during its negotiation and signing." *Id*. at 1219. "Had the Petitioner[] been informed about the Government's intention to forego federal prosecution of Epstein in deference to him pleading guilty to state charges," the district court emphasized, she "could have conferred with the attorney for the Government and provided input." *Id*. at 1218. The court concluded that it was precisely "this type of communication between prosecutors and victims that was intended by the passage of the CVRA." *Id*. at 1291.

9

Having found CVRA violations, the court directed the parties—which by then included Epstein as an intervenor—to brief "the issue of what remedy, if any, should be applied." *Id*. at 1222. In response, petitioner proposed multiple remedies: (1) rescission of the NPA; (2) an injunction against further CVRA violations; (3) an order scheduling a victim-impact hearing and a meeting between victims and Alexander Acosta, the former United States Attorney for the Southern District of Florida; (4) discovery of certain grand-jury materials, records regarding prosecutors' decision to enter into the NPA, and files concerning law-enforcement authorities' investigation of Epstein; (5) mandatory CVRA training for employees of the Southern District's United States Attorney's office; and (6) sanctions, attorneys' fees, and restitution. In August 2019, while the court was considering the parties' briefing regarding remedies, Epstein died of an apparent suicide; his death prompted another round of briefing on the issue of mootness.

In September 2019, having considered the parties' briefing and the impact of Epstein's death, the district court dismissed petitioner's suit, denying each of her requested remedies. *See Doe 1 v. United States*, 411 F. Supp. 3d 1321 (S.D. Fla. 2019). In its order, the district court made a number of rulings. First, it held that Epstein's death mooted any claim regarding the NPA's continuing validity, as he was no longer subject to prosecution. *See id*. at 1326. Relatedly, the court held that it lacked jurisdiction to consider petitioner's claim regarding the validity of the

10

NPA as it applied to Epstein's coconspirators; any opinion regarding that issue, the court concluded, would be merely advisory because the coconspirators—as non-parties to the suit—couldn't be estopped from asserting the NPA's validity at any future prosecution. *See id*. Second, the court denied petitioner's request for an injunction on the ground that she had failed to show "continuing, present adverse effects" or any "real and immediate" threat of future CVRA violations. *Id*. at 1328. Third, the court rejected petitioner's requests for a victim-impact hearing and a meeting with Acosta on the grounds that petitioner had already participated in an Epstein-related hearing in New York, that the Epstein prosecution had concluded, and that the government had already agreed to confer with victims concerning any ongoing investigation of Epstein's coconspirators. *See id*. at 1328–29. Fourth, the court denied petitioner's discovery requests for grand-jury materials and investigative files. *See id*. at 1329–40. Fifth, the court declined to order "educational remedies," as the government had already agreed to implement CVRA training for employees of the Southern District's United States Attorney's office. *Id*. at 1330. And finally, the court rejected petitioner's request for sanctions, fees, and restitution. *See id*. at 1330–31.

Seeking review of the district court's order refusing every remedy that she had sought, petitioner filed—as the CVRA directs—a petition for writ of mandamus with this Court. *See* 18 U.S.C. § 3771(d)(3) (stating that "[i]f the

11

district court denies the relief sought," a victim "may petition the court of appeals for a writ of mandamus"). The government filed a "brief in response" in which it not only opposed petitioner's arguments on the merits, but also raised several threshold arguments concerning the scope of the CVRA and the circumstances in which rights under the Act are judicially enforceable. In reply, petitioner contended (among other things) that by failing to "cross appeal," the government had waived its arguments about the CVRA's applicability and enforceability.[5]

*  *  *

This case presents a host of issues, many of first impression. Before jumping in, we begin with an introductory summary of the CVRA.

### III

The CVRA is a compact statute, occupying but one section (and only two pages) of the United States Code. *See* 18 U.S.C. § 3771. The entire Act comprises just six subsections, the pertinent portions of which we will summarize briefly.

The Act opens, in subsection (a), with a catalogue of "rights" that federal law guarantees to "crime victims." (The Act separately defines the term "crime victim" to mean "a person directly and proximately harmed as a result of the commission of a Federal offense." *Id*. § 3771(e)(2)(A).) The version of the CVRA

---

[5] Although the CVRA instructs the court of appeals to "take up and decide" any mandamus petition "forthwith within 72 hours," the parties here stipulated to an extended briefing and decision schedule, which the CVRA authorizes. 18 U.S.C. § 3771(d)(3).

in effect during the events in question here—between 2006 and 2008—stated as follows:

> **(a) Rights of crime victims.**—A crime victim has the following rights:
>
> **(1)** The right to be reasonably protected from the accused.
>
> **(2)** The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
>
> **(3)** The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.
>
> **(4)** The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
>
> **(5)** The reasonable right to confer with the attorney for the Government in the case.
>
> **(6)** The right to full and timely restitution as provided in law.
>
> **(7)** The right to proceedings free from unreasonable delay.
>
> **(8)** The right to be treated with fairness and with respect for the victim's dignity and privacy.

18 U.S.C. § 3771(a).

Subsection (b), titled "Rights afforded," focuses on courts' responsibilities under the Act.  It provides—as relevant here—that "[i]n any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a)."  *Id*. § 3771(b)(1).

(Subsection (b)(2) pertains to habeas corpus proceedings, in which crime victims enjoy a more limited set of rights; it isn't relevant here.)

Subsection (c), titled "Best efforts to accord rights," imposes obligations on *non*-judicial actors. One of its constituent clauses—which we introduced earlier as the so-called "coverage" provision—states as follows:

> Officers and employees of the Department of Justice and other departments and agencies of the United States engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a).

18 U.S.C. § 3771(c)(1).

Subsection (d) addresses "Enforcement and limitations." Several of subsection (d)(3)'s provisions are relevant here. One—the "venue" provision—states that "[t]he rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in which the crime occurred." Another provides that "[i]f the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus"—and as amended in 2015, and thus before petitioner sought review here, it goes on to clarify that in deciding any mandamus petition under the CVRA, "the court of appeals shall apply ordinary standards of appellate review." Subsection (d)(6) is also relevant in two respects. First, it states that "[n]othing in this chapter shall be construed to authorize a cause of action for

14

damages." Second, and separately, it emphasizes that "[n]othing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction."

Finally, subsection (f)—we've already introduced subsection (e), which defines the term "crime victim"—instructs the Attorney General to "promulgate regulations to enforce the rights of crime victims and to ensure compliance by responsible officials with the obligations" concerning those victims. *Id.* § 3771(f)(1).

With that primer, we proceed to address petitioner's case.

## IV

Petitioner contends—and as already explained, the undisputed facts show—that federal prosecutors in the Southern District of Florida negotiated "a secret non-prosecution agreement" with Epstein, and that "[f]rom the time that the FBI began investigating Epstein through the consummation of the secret NPA, the Government never conferred with Epstein's victims about the NPA [or] even told them that such an agreement was under consideration." Petition for Writ of Mandamus at 4–5. By keeping her (and others) in the dark concerning Epstein's NPA, petitioner asserts, the government violated the CVRA.

The unique circumstances of this case—and in particular, the fact that Epstein was never charged in the Southern District of Florida—tee up what the

15

district court correctly called a "threshold" question:  Does the CVRA apply in the period before criminal proceedings are initiated, either by criminal complaint, information, or indictment?  If it does, then we must proceed to consider a cascade of logically subsequent questions—among them, (1) whether the Act authorized the district court to rescind the NPA, both generally and, more specifically, as applied to Epstein's alleged coconspirators; (2) whether petitioner was entitled to discovery of certain grand-jury materials, DOJ records pertaining to prosecutors' decision to enter into the NPA, and FBI files concerning the Epstein investigation; (3) whether petitioner's participation in an Epstein-related victim-impact hearing in New York effectively moots her request for relief here; and (4) whether federal law entitles petitioner to recover attorneys' fees.  If, by contrast, the CVRA doesn't apply before the commencement of criminal proceedings, then our inquiry is at an end.[6]

---

[6] Before considering the merits of the question whether the CVRA applies before the initiation of criminal proceedings, we must briefly address a front-end procedural issue.  Petitioner contends (Reply in Supp. of Pet. at 11–14) that the government waived any argument that the CVRA doesn't apply here when it failed to file a "cross-appeal" from the district court's 2011 order, which (as already explained) held "as a matter of law [that] the CVRA can apply before formal charges are filed." *Does*, 817 F. Supp. 2d at 1343.  We reject petitioner's waiver argument.  It's true that in the usual case, the government's failure to cross-appeal the district court's adverse 2011 order might well have precluded our review of that decision. *See Greenlaw v. United States*, 554 U.S. 237, 244–45 (2008).  This, though, isn't the usual case.  Petitioner didn't file an "appeal"; rather, as the CVRA requires, she filed a petition for writ of mandamus. *See* 18 U.S.C. § 3771(d)(3); *see also* 16 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3932 (3d ed. 2019) (explaining that a mandamus petition is "an original application to the court of appeals").  The question before us, therefore, is not whether to affirm or reverse the district court's orders, but rather whether to grant or deny the petition—and, it seems to us,

16

Whether the CVRA applies prior to the initiation of criminal proceedings is not just a threshold question, but also a question of first impression in this Circuit. The Fifth Circuit has stated—albeit in dictum, without meaningful explanation, and seemingly without the benefit of adversarial testing—that the Act can apply before criminal proceedings begin. *See In re Dean*, 527 F.3d 391, 934 (5th Cir. 2008). The Sixth Circuit has deemed it "uncertain" whether CVRA protections apply "prior to [the] filing of . . . charges." *In re Acker*, 596 F.3d 370, 373 (6th Cir. 2010). The district courts that have considered the question are divided. *Compare, e.g.*, *United States v. Oakum*, No. 3:08CR132, 2009 WL 790042, at *2 (E.D. Va. Mar. 24, 2009) (holding that CVRA rights can attach prior to the commencement of criminal proceedings), *with, e.g.*, *United States v. Daly*, No. 3:11CR121 AWT, 2012 WL 315409, at *4 (D. Conn. Feb. 1, 2012) (holding to the contrary).

As already explained, the district court here concluded that the CVRA *can* apply before the initiation of criminal proceedings—"pre-charge," for short—and, accordingly, that petitioner enjoyed the protections of the Act during the period

---

the government is entitled to raise any argument it likes in support of its position that we should deny. And while the CVRA (as amended in 2015 to resolve a then-existing circuit split) directs us to "apply ordinary standards of appellate review" in deciding the mandamus petition, *see* 18 U.S.C. § 3771(d)(3)—rather than the heightened "clear usurpation of power or abuse of discretion" standard that typically applies in the mandamus context, *In re Loudermilch*, 158 F.3d 1143, 1145 (11th Cir. 1998)—it does not direct us to employ the *rules of procedure* that would apply if this were a typical appeal.

17

that preceded the execution of Epstein's NPA.  In particular, petitioner asserts in these proceedings that the government violated her "reasonable right to confer" with the lead prosecutor, 18 U.S.C. § 3771(a)(5), and her right "to be treated with fairness," *id*. § 3771(a)(8)—neither of which, she says, is limited by its terms to the post-charge phase of a criminal prosecution.[7]  In support of her position that CVRA rights can apply before criminal proceedings begin, petitioner points (as did the district court) to § 3771(c)(1)—which refers to federal-government agencies engaged in the "detection [and] investigation" of crime, in addition to its "prosecution"—and to § 3771(d)(3)—which, in specifying the venue where a victim should seek relief under the Act, refers to the eventuality that "no prosecution is underway."

The interpretation of the CVRA that petitioner advances, and that the district court adopted, is not implausible; the CVRA could be read to apply pre-charge. We conclude, though—reluctantly, especially given the mistreatment that petitioner seems to have suffered at the hands of federal prosecutors—that the Act is neither best nor most naturally read that way.  For reasons that we will explain, we hold that (1) the CVRA's text and structure, (2) the historical context in which

---

[7] Petitioner also contends (albeit only in passing) that the government violated her right to "timely notice of any public court proceeding," 18 U.S.C. § 3771(a)(2), in connection with the June 30, 2008 state-court hearing at which Epstein pleaded guilty to Florida prostitution offenses.  *See* Pet. at 54.

18

the Act was passed, and (3) the prosecutorial-discretion principles that the Act was designed to safeguard—and which, we think, petitioner's interpretation would compromise—demonstrate that its protections apply only after the initiation of criminal proceedings. If Congress believes that we have misinterpreted the CVRA—or, for that matter, even if it believes that we have correctly interpreted the statute as currently written but that its scope should be expanded—then it should amend the Act to make its intent clear.

## A

In construing the CVRA, "we begin, as we must, with a careful examination of the statutory text," *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721 (2017), looking "to the particular statutory language at issue, as well as the language and design of the statute as a whole," *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). On balance, we conclude that the Act's terms—including the provisions on which petitioner relies—demonstrate that its protections apply only after the commencement of criminal proceedings.

## 1

We begin where petitioner does, with the catalogue of "rights"—quoted in full above—that the CVRA guarantees to "crime victims." (As already noted, the Act defines the term "crime victim"—more on that later.) Petitioner relies chiefly on § 3771(a)(5)'s guarantee of a "reasonable right to confer with the attorney for

the Government in the case," and § 3771(a)(8)'s guarantee of the "right to be treated with fairness." She contends that by failing to inform her—and worse, affirmatively misleading her—about its ongoing negotiations with Epstein, the government violated both provisions. We will address subsections (a)(5) and (8) in due course, but because "[s]tatutory construction . . . is a holistic endeavor," and because "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme," *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988), we first examine the balance of § 3771(a).[8]

In the main, anyway—and there isn't any real dispute about this—the CVRA's enumeration seems to focus on the post-charge phase of a criminal prosecution, and in particular on ensuring that crime victims have notice of (and an opportunity to be heard in) pending criminal proceedings. Indeed, six of the eight rights listed in § 3771(a)—all except for those specified in subsections (5) and (8)—either expressly refer to or necessarily presuppose the existence of an ongoing criminal proceeding. Subsections (a)(2), (3), (4), and (7) leave no doubt

---

[8] *Accord, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 167 (2012) (quoting Sir Edward Coke, *The First Part of the Institutes of the Laws of England, or a Commentary upon Littleton* § 728, at 381a (1628; 14th ed. 1791), for the proposition that "[i]f any section [of a law] be intricate, obscure or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of the other").

20

whatsoever—all of them apply, by their plain terms, to "proceeding[s]," "public proceedings," or "public court proceedings."  Not surprisingly, there seems to be general agreement that these "proceeding"-focused rights apply only after the filing of a complaint or criminal charges.  *See* Reply in Supp. of Pet. at 17; Paul G. Cassell, *et al.*, *Crime Victims' Rights During Criminal Investigations? Applying the Crime Victims' Rights Act Before Criminal Charges Are Filed*, 104 J. of Crim. L. and Criminology 59, 71 (2014).

Subsections (a)(1) and (6) aren't quite as clear, but they too are best understood as specifying rights that attach only after criminal proceedings have begun.  Subsection (1) guarantees a crime victim's right to protection from "the accused."  § 3771(a)(1).  Both in ordinary spoken English and as a legal term of art, the word "accused" refers to someone against whom criminal proceedings have been commenced.  *See, e.g.*, *Webster's New International Dictionary* 17 (2d ed. 1944) (defining "accused" as "one charged with an offense; the defendant in a criminal case"); *see also Michigan v. Jackson*, 475 U.S. 625, 632 (1986) ("[A]fter a formal accusation has been made . . . a person who had previously been just a 'suspect' has become an 'accused' within the meaning of the Sixth Amendment . . . .").  Subsection (a)(6), which guarantees a victim's right to "full and timely restitution," likewise presupposes the initiation—and indeed perhaps the maturation or even conclusion—of criminal proceedings.  *Black's*, for instance,

21

defines the term "restitution," in relevant part, to mean "[c]ompensation for loss; esp., full or partial compensation paid by a criminal to a victim, not awarded in a civil trial for tort, but ordered as part of a criminal sentence or as a condition of probation." *Black's Law Dictionary* 1507 (10th ed. 2014).

So, it seems to us, the rights enumerated in subsections (a)(1), (2), (3), (4), (6), and (7) are properly understood as applying only after the initiation of criminal proceedings. And again, petitioner doesn't really contend otherwise. Instead, she focuses on subsections (a)(5) and (8), which she says are framed broadly enough that they can be understood to apply pre-charge. Let's take a closer look.

Subsection (a)(5) guarantees a crime victim the "reasonable right to confer with the attorney for the Government in the case." Petitioner and her lead counsel (in his academic writings) emphasize that this provision refers to the attorney handling "the case" rather than "the charges," Reply in Supp. of Pet. at 17, and they assert that the term "case" can "refer both to a *judicial* case before a court and an *investigative* case pursued by a law enforcement officer," Cassell *et al.*, *supra*, at 72 (emphasis added).[9] Although it's true, at least in the abstract, that the term

---

[9] Ordinarily, of course, we don't impute a lawyer's out-of-court positions to his client—and we needn't do so even in this case. We cite Professor Cassell's article here (and elsewhere) for several reasons: (1) because he is not only petitioner's counsel but also one of the nation's foremost authorities on victims'-rights issues in general and the CVRA in particular; (2) because the article is wholly consistent with petitioner's position as articulated in her brief and at oral argument; and (3) because it expands on and deepens petitioner's in-court arguments and thus ensures that we are considering the strongest version of her position.

"case" *can* mean either thing, in legal parlance the judicial-case connotation is undoubtedly primary. *See, e.g.*, *Black's*, *supra*, at 258–59 (defining "case" first as "[a] civil or criminal proceeding, action, suit or controversy at law or in equity" and only second as "[a] criminal investigation"); *Webster's New International*, *supra*, at 415 (defining "case" as used in "[l]aw" as "a suit or action in law or equity; a cause"). Moreover, and in any event, two contextual considerations convince us that, as used in subsection (a)(5), the term "case" refers to an ongoing judicial proceeding, not a law-enforcement investigation.

First, the Supreme Court has held that in the criminal context, a "case" does not "encompass the entire criminal investigatory process," but rather "at the very least requires the initiation of legal proceedings." *Chavez v. Martinez*, 538 U.S. 760, 766 (2003). Notably, in so holding, the Court drew on longstanding tradition, citing its now nearly 150-year-old decision in *Blyew v. United States* for the proposition that the word "case" is synonymous with the word "cause" and "mean[s] a proceeding in court, a suit, or action." 80 U.S. (13 Wall.) 581, 595 (1872). Second, and separately, subsection (a)(5) refers not just to "the case" in general, but more particularly to "the attorney for the Government in the case." While it is undoubtedly true that government lawyers may be involved in a criminal investigation pre-charge, the provision's reference to a single, specific individual—"the attorney for the Government"—indicates that the conferral right

23

attaches only after proceedings have begun, at which point that particular person will presumably be more readily identifiable. *Cf. Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004) (holding that the "use of the definite article . . . indicates that there is generally only one" person covered). By the same token, there will surely be many criminal investigations to which no lawyers have (yet) been assigned—let alone a single, identifiable "attorney for the Government." Accordingly, if, as petitioner asserts, subsection (a)(5) was intended to apply pre-charge, during the investigation phase, it makes little sense that Congress would have tethered the conferral right to a single government lawyer.

On balance, therefore—and particularly in the light of subsections (a)(1), (2), (3), (4), (6), and (7), all of which clearly apply only after the initiation of criminal proceedings—we conclude that § 3771(a)(5)'s conferral right does not attach during the pre-charge, investigatory phase. Rather, subsection (a)(5) is best understood as guaranteeing a crime victim's right to consult with the lead prosecutor—*i.e.*, "the attorney for the Government"—in a pending prosecution—*i.e.*, "the case."[10]

---

[10] *See generally* Wayne R. LaFave et al., *Criminal Procedure* § 13.1, at 849 (6th ed. 2017) ("Under the federal victims' rights statute [*i.e.*, 18 U.S.C. § 3771], a crime victim is granted a 'reasonable right to confer with the attorney for the Government in the case,' but it is nowhere specified that the conference must precede or concern the prosecutor's charging decision . . . .").

Petitioner also relies (albeit more obliquely) on subsection (a)(8), which vaguely guarantees a crime victim's right "to be treated with fairness and with respect for [his or her] dignity and privacy." It is certainly true that this fair-treatment right has no inherent temporal limitation—on its face, it could apply pre-charge, post-charge, or for that matter even post-conviction. But well-established canons of interpretation require us to interpret subsection (a)(8)'s general right to fair treatment by reference to the subsections (and their constituent rights) that precede it. *See, e.g.*, *Johnson v. United States*, 559 U.S. 133, 139 (2010) ("Ultimately, context determines meaning . . . ."); *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000) ("[W]ords and people are known by their companions."). Because the rights enumerated in subsections (a)(1)–(7) are best understood as applying only after the institution of criminal proceedings, subsection (a)(8)'s guarantee of "fairness" is, too. What the Supreme Court said recently in applying *noscitur a sociis*—"the well-worn Latin phrase that tells us that statutory words are often known by the company they keep"—applies here as well: In § 3771(a), "we find . . . both the presence of company that suggests limitation and the absence of company that suggests breadth." *Lagos v. United States*, 138 S. Ct. 1684, 1688–89 (2018).[11]

---

[11] In spending pages dissecting our citations to cases applying the *noscitur a sociis* canon, the dissent misses the forest for the trees. *See* Dissenting Op. at 98–100. The fundamental point is

Taken as a whole, then, we conclude that the catalogue of rights specified in § 3771(a) are best read as applying only after the institution of criminal proceedings.

**2**

We are fortified in that conclusion by the only two provisions of the Act that speak directly to judicial enforcement of victims' statutory rights.

The first is § 3771(b), titled "Rights afforded." At oral argument, petitioner's counsel invoked subsection (b)(1) affirmatively, noting—with emphasis—its directive that "the court *shall ensure* that the crime victim is afforded the rights" enumerated in subsection (a). *See* Oral Arg. at 5:45–5:57. True, but that's only part of the story. In its entirety, subsection (b)(1) reads as follows: "*In any court proceeding involving an offense against a crime victim*, the court shall ensure that the crime victim is afforded the rights described in subsection (a)." 18 U.S.C. § 3771(b)(1) (emphasis added). By its plain terms, then, subsection (b)(1) empowers courts to enforce CVRA rights *only* during pending criminal proceedings—of which there were none here.

---

simply that subsection (a)(8)'s meaning should be informed by its surrounding statutory context, and that because subsections (a)(1)–(7) are most properly read to apply only after the commencement of criminal proceedings, it makes sense—absent some contrary indication—to interpret subsection (a)(8)'s vague fair-treatment provision the same way.

26

The second is § 3771(d), which specifies—and strictly circumscribes—the procedural mechanisms by which an alleged victim must assert and seek to enforce CVRA rights. Two (related) points are worth making. As an initial matter, the Act clearly indicates that Congress did not intend to authorize private individuals to initiate stand-alone suits or actions, outside the confines of existing criminal proceedings, to enforce their statutory rights. Quite the contrary, in fact— subsection (d)(6), titled "No Cause of Action," expressly states that "[n]othing in this chapter shall be construed to authorize a cause of action for damages." § 3771(d)(6)). *Cf. Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (explaining that "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress").

Instead—and this is point two—subsection (d)(3) specifies that a victim must assert his or her rights in a "motion for relief" filed in district court and requires the court to consider and decide that "motion" promptly. 18 U.S.C. § 3771(d)(3). As commonly understood, a "motion" is a request filed within the context of an ongoing judicial proceeding, not a vehicle for launching a new and freestanding piece of litigation.[12] *See, e.g.*, *Black's*, *supra*, at 1168 ("'Frequently,

---

[12] As already explained, subsection (d)(3) states that "[t]he rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in which the crime occurred." We address below petitioner's contention that the "if no prosecution is underway" language demonstrates that the CVRA applies before the initiation of criminal proceedings. *See infra* at 33–36.

27

in the progress of litigation, it is desired to have the court take some action which is incidental to the main proceeding . . . .  Such action is invoked by an application usually less formal than the pleadings, and is called a motion.'" (quoting John C. Townes, *Studies in American Elementary Law* 621 (1911)); *cf.* Fed. R. Civ. P. 3, 7 (distinguishing between a "motion" and a "pleading"—the latter of which is defined to include a "complaint," which is the prescribed vehicle for commencing a freestanding action).[13]

The facts that the CVRA (1) does not sanction freestanding suits and (2) does prescribe mid-proceeding "motion[s]" combine—especially in conjunction

---

[13] A third aspect of § 3771(d)(3) likewise counsels—albeit perhaps a bit more indirectly—in favor of the conclusion that CVRA rights are intended to apply, and be enforced, only within the context of an ongoing criminal prosecution.  As already explained, under subsection (d)(3), a crime victim's sole recourse to this Court is via petition for writ of mandamus.  *See* 18 U.S.C. § 3771(d)(3) ("If the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus.").  Although a petition for mandamus is "an original application to the court of appeals," the writ "is not an independent grant of appellate jurisdiction" but, rather, "'may go only in aid of appellate jurisdiction' that exists on some other basis."  16 Wright & Miller, *supra*, § 3932 (quoting *Parr v. United States*, 351 U.S. 513, 520 (1956)).  The "minimum condition" for mandamus relief, therefore, is "that the case be one that may lie within the prospective future jurisdiction of the court of appeals, or that has in fact come within its jurisdiction in the past."  *Id.*  When CVRA rights are asserted in the context of a criminal proceeding, our mandamus jurisdiction is clear, because our *appellate* jurisdiction over the underlying criminal proceeding (and any rulings, verdicts, and judgments rendered therein) is clear.  And the CVRA itself provides that "[i]n any appeal in a criminal case, the Government may assert as error the district court's denial of any crime victim's right in the proceeding to which the appeal relates."  18 U.S.C. § 3771(d)(4).  By contrast, in the absence of a criminal prosecution, mandamus jurisdiction in this Court is less certain—harder to justify—simply because it's less certain how the case could otherwise arrive, in the form of an appeal, on our doorstep.

28

with subsection (a)'s enumeration—to indicate that the Act's protections apply only after the initiation of criminal proceedings.[14]

**3**

In fairness, petitioner is not without her own textual arguments. In urging us to hold that CVRA rights—or at least some of them—apply even before the initiation of criminal proceedings, she relies principally on two subsections, which the parties call the "coverage" and "venue" provisions, respectively. Neither, we conclude, clearly demonstrates that the rights specified in the Act attach during the pre-charge, investigative phase.

Petitioner first points to § 3771(c)(1)—the "coverage" provision—which, as already explained, states that "[o]fficers and employees of the Department of Justice and other departments and agencies of the United States engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection

---

[14] It is also relevant, we think—even if more marginally so—that the drafters and ratifiers of the Federal Rules seem to have anticipated that CVRA "motions" would be filed within the context of an existing criminal proceeding—not as freestanding actions. The Federal Rules of Criminal Procedure, which "govern the procedure in all criminal proceedings" in United States courts, *see* Fed. R. Crim. P. 1(a)(1), expressly incorporate portions of the CVRA. In particular, Rule 60— titled "Victim's Rights"—implements several of the rights specified in § 3771(a), and further (echoing § 3771(d)(3)) clarifies that "[a] victim's rights described in these rules must be asserted in the district where a defendant is being prosecuted for the crime." Fed. R. Crim. P. 60(b)(4). The Federal Rules of Civil Procedure, which "govern the procedure in all civil actions and proceedings in the United States district courts," *see* Fed. R. Civ. P. 1, contain no similar provision, and make no reference to the CVRA.

(a)." 18 U.S.C. § 3771(c)(1). From the premise that "the CVRA applies to the 'detection [or] investigation' of crimes," petitioner reasons to the conclusion, which the district court adopted, that "the Act's drafters 'surely contemplate[d] pre-charge application of the CVRA.'" Reply in Supp. of Pet. at 15 (quoting *Does*, 817 F. Supp. 2d at 1342). We disagree for two reasons.

First, understood in proper context, it seems clear to us that subsection (c)(1) is a "to whom" provision, not a "when" provision. That is, it clarifies that CVRA obligations extend beyond the officers and employees of "the Department of Justice" to include, as well, the officers and employees of "other departments and agencies of the United States" that (like DOJ) are "engaged in the detection, investigation, or prosecution of crime"—*e.g.*, IRS, ICE, and TSA. Those agencies' employees, like DOJ's, must "make their best efforts to see that crime victims" are afforded CVRA rights. Subsection (c)(1) doesn't expressly speak to when CVRA rights attach, and it certainly doesn't clearly demonstrate that those rights attach before the initiation of criminal proceedings. Government employees (whether of DOJ or some other DOJ-like agency) who are involved in all three of the referenced phases are necessarily involved post-charge. Subsection (c)(1) simply

30

makes clear that the Act reaches beyond prosecutors (and DOJ) to reach other actors in the criminal-justice system.[15]

Second, and more importantly, petitioner's reliance on § 3771(c)(1) proves entirely too much. If, as petitioner thinks subsection (c)(1) shows, CVRA rights apply during the "detection" and "investigation" of crime, then there is no meaningful basis—at least no meaningful *textual* basis—for limiting the Act's pre-charge application to the NPA context. To the contrary, on petitioner's reading, subsection (c)(1) would—to cite just a few examples—require law-enforcement officers to "confer" with victims, subject only to a squishy "reasonable[ness]" limitation, *see* § 3771(a)(5), before conducting a raid, seeking a warrant, making an arrest, interviewing a witness, convening a lineup, or conducting an interrogation. Absent a much clearer indication, we cannot assume that Congress intended such a jarring result. Presumably sensing the slipperiness of their position, petitioner and her counsel have said that courts can simply draw the line

---

[15] Petitioner's counsel has contended that this interpretation of § 3771(c)(1) can't explain "why Congress found it necessary to break out three separate phases of the criminal justice process: the 'detection,' 'investigation,' and 'prosecution' of crime." Cassell *et al.*, *supra*, at 87. If, he argues, Congress's "intent was simply to cover, for example, FBI agents or EPA agents during the post-charging phase of a case, it could have simply omitted" the words "detection" and "investigation" from the Act, because those agents "would be engaged in the 'prosecution' of the case when assisting the victim after the filing of formal charges." *Id*. Thus, he says, our interpretation impermissibly renders the terms "detection" and "investigation" meaningless. *Id*. We don't think so. We read subsection (c)(1) not as "break[ing] out" three different phases, but rather as attempting to broadly cover (perhaps using a belt-and-suspenders approach) all necessary government-employee participants—in short, to ensure that the Act's protection extends beyond prosecutors.

31

farther downstream—when, for instance, as counsel put it at oral argument, an investigation has "matured" to the point where (as here) prosecutors "are negotiating with defense attorneys and signing agreements." Oral Arg. at 8:30, 9:10–9:17. "At that point at least," counsel said, "a conferral right exists" under subsection (a)(5). *Id*. at 9:10–9:17. That is a line, to be sure—and a line that happens to capture this case—but it has no footing whatsoever in the "detection [or] investigation" language to which petitioner points in support of her position.[16] As tempting as it might be to do so—especially on the facts before us here—we cannot re-write, or arbitrarily circumscribe, the Act's text simply to make it fit petitioner's theory.[17]

For these reasons, we cannot accept petitioner's contention that § 3771(c)(1) demonstrates that the CVRA applies before the initiation of criminal proceedings.

---

[16] In his article on the subject, petitioner's lead counsel offered a similar limiting construction, which he framed this way:

> CVRA rights attach when an officer or employee of the Department of Justice or any other department or agency of the United States engaged in the detection, investigation, or prosecution of crime *has substantial evidence that an identifiable person has been directly and proximately harmed as a result of the commission of a federal offense . . . and in the judgment of the officer or employee, that person is a putative victim of that offense.*

Cassell *et al*., *supra*, at 92 (emphasis added). Professor Cassell's proposal reads like a finely-tuned statutory provision—but one that, unfortunately, Congress never enacted.

[17] For reasons we will explain, the dissent's interpretation—so far as we can discern it—suffers from the same flaw. *See infra* at 51–52.

Petitioner is on slightly stronger footing, we think, in pointing to the CVRA's "venue" provision, § 3771(d)(3). In relevant part, that provision states that "[t]he rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in which the crime occurred." Petitioner contends—and the district court agreed—that the "no prosecution is underway" clause *must* mean that CVRA rights "'may be enforced before a prosecution is underway'" and, accordingly, that "'those rights must attach before a complaint or indictment formally charges the defendant with the crime.'" Reply in Supp. of Pet. at 15 (quoting *Does*, 817 F. Supp. 2d at 1342). Petitioner's interpretation of subsection (d)(3) is not implausible—that provision could be read to mean that CVRA rights attach before the commencement of criminal proceedings. But it isn't necessary, either, and in light of the remainder of the Act's text—and the practical implications of petitioner's construction, the details of which we explore below—we are reluctant to adopt it, or at least to invest it with the significance that petitioner does.

There are, we think, at least two alternative ways of understanding § 3771(d)(3). First, and perhaps most obviously, it could be read to apply to the period of time between the initiation of criminal proceedings—which may occur as early as the filing of a criminal complaint under Federal Rule of Criminal

Procedure 3—and the levying of formal charges in an indictment.[18]  The word

"prosecution"—on which subsection (d)(3) pivots—is a legal term of art; in

relevant part, it refers to "[t]he institution and continuance of a criminal suit [and]

the process of exhibiting formal charges against an offender before a legal tribunal,

and pursuing them to final judgment on behalf of the state or government, as by

indictment or information."  *Webster's New International*, *supra*, at 1987.

Moreover, the law is clear, at least for Sixth Amendment right-to-counsel

purposes, that a "prosecution" does *not* begin with the criminal complaint's filing.

*See United States v. Alvarado*, 440 F.3d 191, 199–200 (4th Cir. 2006) ("The filing

of a federal criminal complaint does not commence a formal prosecution."); *see

also, e.g.*, *United States v. States*, 652 F.3d 734, 741–42 (7th Cir. 2011) (same);

*United States v. Boskic*, 545 F.3d 69, 82–84 (1st Cir. 2008) (same).  Rather, the

Sixth Amendment right does not attach—because a "prosecution" does not

begin—until, at the earliest, a suspect's "initial appearance before a judicial

officer."  *Rothgery v. Gillsespie County, Tex.*, 554 U.S. 191, 199 (2008).  All of

which is to say that even if petitioner and the district court were correct that the

"no prosecution is underway" clause meant that CVRA rights apply "before"

---

[18] Presumably because it finds this the more difficult of the two interpretations of subsection (d)(3) to deal with, the dissent labels it our "alternative[]" position and relegates its response to a footnote—notwithstanding that we introduce it as the "[f]irst, and perhaps most obvious[]" reading.  *See* Dissenting Op. at 92 n.17.  By contrast, the dissent goes on for pages challenging what we offer (next page) as an "alternative[]" interpretation, (mis)stating our position as being that "this venue provision is about 'post-judgment' matters."  *Id*. at 91–93.

34

formal charges are filed, they may yet be incorrect that those rights should be understood to attach during a pre-complaint investigation.  Subsection (d)(3) can be read sensibly enough to apply (and to give victims the right, for example, to "confer" with prosecutors, § 3771(a)(5)) between the filing of the criminal complaint and the suspect's initial appearance before a judge—and thus, for instance, to express their views to prosecutors about whether the defendant should be granted pretrial release.  *See* Fed. R. Crim. P. 5(d)(1)(C) (noting that pretrial-release decisions are made at the "initial appearance").

Alternatively, subsection (d)(3) could be interpreted to refer to the period *after* a "prosecution" has run its course and resulted in a final judgment of conviction.  Petitioner and the district court read the "no prosecution is underway" clause to say, in effect, "no prosecution is [*yet*] underway"—thereby necessarily pointing to the period "before" (their word) the prosecution's commencement.  But subsection (d)(3)'s is temporally agnostic—on its face, it could just as easily mean that "no prosecution is [*still*] underway."  *Cf. Underway,* Oxford English Dictionary, https://oed.com/view/Entry/212225?rskey=hlolT7&result=1#eid (last visited April 13, 2020) (defining "underway" as it pertains to "a process, project, [or] activity" to mean "set in progress; in the course of happening or being carried out").  No one doubts, for instance, that a victim could file a post-judgment motion alleging that the government violated her rights during the course of the

35

prosecution and asking the court, say, to "re-open a plea or sentence."  18 U.S.C. § 3771(d)(5).[19]

Moreover, petitioner's broad reading of § 3771(d)(3) suffers from the same slippery-slope problems that plague her reading of § 3771(c)(1).  To say, as the petitioner does—and as the district court did—that subsection (d)(3) indicates that CVRA "rights must attach *before* a complaint or indictment formally charges the defendant with the crime,'" Reply in Supp. of Pet. at 15 (quoting *Does*, 817 F. Supp. 2d at 1342), tells us nothing about *how long* "before."  Again, must prosecutors consult with victims before law-enforcement officers conduct a raid, seek a warrant, or conduct an interrogation?  That seems exceedingly unlikely.  As we've explained, petitioner understandably wants to craft a rule that will cover this case without opening the floodgates to those possibilities—seemingly by reference to some sort of once-the-investigation-has-matured criterion.  That criterion, though, has no basis in the CVRA's text.  Petitioner's reading of subsection (d)(3)'s "no prosecution is underway" clause—like her reading of subsection (c)(1)'s "detection [or] investigation" clause—provides no logical stopping point.

\* \* \*

---

[19] We concede that this reading isn't perfectly seamless, in that it would require the victim to file her post-judgment motion "in the district in which the crime occurred" rather than, as one might expect, in the district in which the prosecution occurred and the conviction was entered.

36

For all these reasons, we conclude that the CVRA's text is best read as applying only after the commencement of criminal proceedings, whether by complaint, information, or indictment.[20]

**B**

The historical context in which the CVRA was enacted confirms what the Act's text indicates—namely, that it was not meant to apply prior to the institution of criminal proceedings. Congress enacted the CVRA against the backdrop of another victims'-rights statute, the Victims' Rights and Restitution Act of 1990. The CVRA repealed and replaced some parts of the VRRA, but left others intact.

---

[20] Although a marginal consideration, we also note that our interpretation is consistent with that offered by the Department of Justice, both in its implementing regulations and in an explanatory memorandum authored by the Office of Legal Counsel.

First, as already noted, in the CVRA's concluding subsection Congress directed DOJ to "promulgate regulations to enforce the rights of crime victims and to ensure compliance by responsible officials with the obligations described in law respecting crime victims." 18 U.S.C. § 3771(f)(1). DOJ did so, and those regulations are codified at 28 C.F.R. § 45.10. Although the regulations don't expressly address the question whether CVRA rights apply before the commencement of criminal proceedings, or instead only afterward, they do, on balance, seem to assume the latter interpretation. The provision specifying the information that an alleged victim must include in her administrative complaint, for instance, states that the document "shall contain," among other information, "[t]he district court case number" and "[t]he name of the defendant in the case." *Id*. § 45.10(c)(2)(iii)–(iv). Needless to say, both items indicate (even if indirectly) DOJ's considered view that the Act's provisions apply only once a criminal case is pending.

Second, in December 2010, DOJ's Office of Legal Counsel issued a formal 16-page opinion—titled "The Availability of Crime Victims' Rights Under the Crime Victims' Right Act of 2004"—in which it concluded, following an exhaustive analysis, that CVRA rights do *not* apply before the commencement of criminal proceedings. *See* The Availability of Crime Victims' Rights Under the Crime Victims' Rights Act of 2004, 35 Op. O.L.C. 1 (Dec. 17, 2010). OLC's 2010 opinion reinforced and formalized an earlier 2005 determination that had likewise concluded, "preliminar[ily]," that "the rights guaranteed by the CVRA [are] limited in their applicability to pending criminal proceedings." *Id*. at 1.

37

Notably, the "Services to victims" section of the VRRA, which the CVRA preserved, includes provisions that, by their express terms, plainly apply before criminal proceedings begin.[21]

That section opens with a phrase that the CVRA repeats—noting that it applies to government agencies "engaged in the detection, investigation, or prosecution of crime." 34 U.S.C. § 20141(a). Unlike the CVRA, though, the VRRA directs the head of each such agency to designate individuals who will be responsible for identifying victims and for performing certain victim-related services "at each stage of a criminal case." *Id*. The VRRA goes on state that "[a]t the earliest opportunity after the detection of a crime at which it may be done without interfering with an investigation, a responsible official shall . . . identify the victim or victims of a crime [and] inform the victims of their right to receive, on request, [certain enumerated] services." *Id*. § 20141(b). By referring to the period immediately following "the detection of a crime" and to the existence of an ongoing "investigation"—with which the responsible official should be careful not to "interfer[e]"—the VRRA clearly extends victim-notice rights into the pre-charge phase.

---

[21] In a legislative-history-laden footnote, the dissent accuses us of "fail[ing] to recognize the CVRA *repealed* significant parts of the VRRA." Dissenting Op. at 101 n.21. As the paragraph to which this note is appended demonstrates, that is incorrect. The point—which we explain in text and to which the dissent offers no response—is that *the portions of the VRRA that the CVRA left in place* contain provisions that explicitly apply pre-charge, and that if Congress had intended the CVRA to have the same reach, it could (and should) have said so.

The VRRA is similarly explicit when describing the sorts of "services" to which victims are entitled. Following subsection (a)'s direction, subsection (c) marches—methodically, and roughly chronologically—through the various "stage[s]" of a crime's commission, detection, investigation, and prosecution. Subsection (c)(1) states, for instance, that "the responsible official shall"—presumably immediately in the aftermath of a crime's commission, and thus by definition before any charges are filed—inform the victim where she can "receive emergency medical and social services." *Id*. § 20141(c)(1)(A). Subsection (c)(2) then provides that the responsible official shall ensure that the victim receives "reasonable protection from a suspected offender"—notably, not "the accused," as in the CVRA, but "a suspected offender." *Id*. § 20141(c)(2). Continuing, subsection (c)(3) states that the official shall provide the victim "the earliest possible notice" of, among other things, and under appropriate circumstances, "the status of the investigation of the crime" and "the arrest of the suspected offender"—both of which, obviously, refer to pre-charge events. *Id*. § 20141(c)(3)(A)–(B). It is not until subsection (c)(3)(C)—which refers to "the filing of charges against a suspected offender"—that the VRRA's focus conspicuously shifts to rights pertaining to "charges," "trial[s]," "hearing[s]," and "proceedings." *See id*. § 20141(c)(3)(C)–(c)(5).

39

The VRRA's provisions—about which Congress indisputably knew when it framed and enacted the CVRA—demonstrate that when Congress wants to extend victims-rights protections pre-charge, it knows how to do so, and does so expressly. The fact that the CVRA contains no similar language counts heavily against petitioner's interpretation under what we have called an entire "family" of interpretive canons. *See Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1209 (11th Cir. 2009) (citing the interrelated principles, for instance, that "where Congress knows how to say something but chooses not to, its silence is controlling," and that "when Congress uses different language in similar sections, it intends different meanings" (citations omitted)).[22]

\* \* \*

Together, these textual and contextual considerations lead us to conclude that, on balance, the CVRA is best interpreted to apply only after the commencement of criminal proceedings. Although not precisely on point, we find resonance in much of what the Supreme Court recently said in *Lagos v. United*

---

[22] One might reasonably ask why petitioner here didn't proceed under the VRRA, some of whose provisions (unlike, we conclude, the CVRA's) clearly apply before the initiation of criminal proceedings—and which, therefore, the government here may well have violated. The answer, in short, is that the VRRA provides no mechanism for judicial enforcement whatsoever—not even the limited "motion"-based remedy that the CVRA authorizes. *See* 34 U.S.C. § 20141(d) ("This section does not create a cause of action or defense in favor of any person arising out of the failure of a responsible person to provide information as required . . . ."). So, while (on our reading, anyway) the rights available under the VRRA are more broadly applicable than those under the CVRA, they are not judicially enforceable—and thus, as we will explain shortly, don't give rise to the practical concerns that a pre-charge application of CVRA rights would.

40

*States*, 138 S. Ct. 1684 (2018), which concerned another federal victims'-rights statute, the Mandatory Victims Restitution Act. In particular, the Court there addressed a portion of that statute requiring reimbursement of expenses that a crime victim "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). The question before the Court was whether that provision should be interpreted narrowly, to require reimbursement only of those expenses that a victim incurred during a *government* "investigation" and *criminal* "proceedings," or more broadly, to include expenses incurred during *any* "investigation" and *any* case-related "proceedings." *Lagos*, 138 S. Ct. at 1688.

The Court unanimously adopted the narrower reading. In doing so, the Court readily acknowledged that there were "contrary arguments . . . favoring a broad interpretation"—in particular, that the more limited reading "will sometimes leave a victim without a restitution remedy sufficient to cover" some offense-related expenses and thereby contravene the Act's "broad purpose." *Id*. at 1689. The Court further conceded that while it thought the statute's "individual words suggest[ed]" a more "limited interpretation," they "d[id] not demand" it. *Id*. at 1688. Even so, the Court held that, understood in context—for instance, the fact that the terms "investigation" and "proceedings" were both linked to the word "prosecution"—the more limited reading was preferable from a textual and

41

structural standpoint.  The Court also emphasized that "Congress ha[d] enacted many different restitution statutes with differing language, governing different circumstances," and that while some of them contained provisions specifically requiring "full" restitution, the Mandatory Victims Restitution Act "contain[ed] no such language."  *Id*. at 1689–90.

The Court concluded its interpretive analysis this way: "[G]iven th[e] differences between the Mandatory Victims Restitution Act and other restitution statutes, we conclude that the considerations we have mentioned, particularly those based on a reading of the statute as a whole, tip the balance in favor of our more limited interpretation."  *Id*. at 1690.  Just so here.  In light of CVRA's text's overarching focus on the period following the initiation of criminal proceedings, and the obvious differences between the CVRA and the VRRA—which by its terms plainly reaches into the pre-charge phase—we too conclude that the interpretive balance tips in favor of a more limited reading.

## C

There is a final consideration here, and it is to our minds a weighty one.  The CVRA's final substantive provision—which Congress slotted in just before statutory definitions and a closing directive to the Attorney General to promulgate implementing regulations—states that "[n]othing in this chapter [*i.e.*, the entirety of the Act] shall be construed to impair the prosecutorial discretion of the Attorney

42

General or any officer under his direction." 18 U.S.C. § 3771(d)(6). For reasons we will explain, we conclude that petitioner's "constru[ction]" of the Act—as applying before the initiation of criminal proceedings—would indeed "impair . . . prosecutorial discretion."

Broadly defined, the term "prosecutorial discretion" refers to the soup-to-nuts entirety of "[a] prosecutor's power to choose from the options available in a criminal case, such as filing charges, prosecuting, not prosecuting, plea-bargaining, and recommending a sentence to the court." *Black's*, *supra*, at 565. The core of prosecutorial discretion, though—its essence—is the decision whether or not to charge an individual with a criminal offense in the first place. The Supreme Court has repeatedly reaffirmed the principle—which dates back centuries—that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974) (citing *Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1869)).[23]

---

[23] This prosecutorial discretion "flows not from a desire to give carte blanche to law enforcement officials but from recognition of the constitutional principle of separation of powers." *United States v. Ream*, 491 F.2d 1243, 1246 n.2 (5th Cir. 1974). As we said in *Ream*—

> The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the

We believe that petitioner's interpretation of the CVRA risks "impair[ing] . . . prosecutorial discretion" in at least two fundamental ways.  As an initial matter, consider that the *very first* determination that a court must make when asked to enforce the CVRA is whether the party seeking the Act's benefit is a "crime victim."  The reason is because the CVRA's opening provision makes clear that the Act's protections—the rights enumerated therein, already discussed at some length—are available *only* to "crime victim[s]."  18 U.S.C. § 3771(a) ("A crime victim has the following rights . . . .").  Notably for our purposes, the CVRA statutorily defines the term "crime victim" to mean "a person directly and proximately harmed as a result of the commission of a Federal offense."  *Id*. § 3771(e)(2).

Accordingly, any movant asserting rights under the CVRA must, at the very outset, demonstrate to the district court that he or she is a "crime victim" entitled to statutory protection.  And, given the statutory definition's terms, in order to determine whether the movant has made the requisite showing, the court must decide whether a "Federal offense" has occurred.  When a prosecutor has already

---

free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.

*Id*. (quoting *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965)); *accord, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("[T]he decision of a prosecutor in the Executive Branch not to indict . . . has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'").

commenced criminal proceedings against an identifiable individual for a specific crime, he or she has made at least a presumptive determination that the individual has in fact committed a "Federal offense." So, as applied post-charge—in the context of ongoing criminal proceedings—the "crime victim" determination is straightforward: An individual who has been "directly and proximately harmed" as a result of the conduct charged by the government is entitled to CVRA protection.

Not so before the commencement of criminal proceedings. In that circumstance, if a movant were to assert CVRA rights as a "crime victim," the court would first have to determine—but this time without any initial determination by the government in the form of a charging decision and, indeed, presumably while the government's investigation is ongoing—whether or not a "Federal offense" has been committed. That scenario—which is a necessary consequence of petitioner's interpretation—presents at least three intractable problems.

First, and most obviously, petitioner's reading puts the cart before the horse: When else, if ever, is a court called on to decide whether an "offense" (*i.e.*, a crime) has occurred—as opposed to a moral wrong more generally—*before* the government has even decided to press charges? The answer, so far as we are aware, is never. Second, how, in the absence of a charging decision, would the court even go about ascertaining whether an "offense" had occurred? What would

45

that proceeding look like? A mini- (or perhaps a not-so-mini-) trial in which the court finds facts and makes legal determinations regarding an "offense" yet to be named? Finally, and in any event, it seems obvious to us that simply by conducting such a proceeding and by concluding (up front) that an "offense" has—or has not—occurred, the court would not only exert enormous pressure on the government's charging decisions, but also likely impair the government's ongoing investigation. The "impair[ment]" of prosecutorial discretion, we think, would be palpable.

Separately, even if the threshold "crime victim" barrier could be overcome, the *enforcement* of CVRA rights in the pre-charge phase would risk unduly impairing prosecutorial discretion. Consider, as a general matter, how CVRA enforcement occurs. If, for instance, an individual claiming to be a covered victim believes—as did petitioner here—that the government hasn't "confer[red]" with her in the manner prescribed by § 3771(a)(5) or "treated [her] with fairness" as required by § 3771(a)(8), then she will—as did petitioner here—ask a district court to "order" prosecutors to confer and to treat her "fair[ly]." *See* Emergency Pet. at 2. Even in the post-charge phase, those are pretty extraordinary requests. It is no small thing to ask a judge to issue an injunction ordering the government's lawyers (presumably on pain of contempt) to conduct their prosecution of a particular matter in a particular manner. But at least after the commencement of criminal

46

proceedings—and accordingly *after* the government has submitted itself and its case to the district court's jurisdiction and supervision—the CVRA explicitly authorizes the court's intervention. Congress made a clear determination that the intrusion was necessary and appropriate.

Before the commencement of criminal proceedings, though, the intrusion would be significantly greater, both quantitatively and qualitatively. As a quantitative matter, petitioner's interpretation—pursuant to which the CVRA's protections would extend into the "detection" and "investigation" phases—risks greatly multiplying the sheer number of opportunities for judicial intervention in law-enforcement and prosecutorial affairs. Freed from any line limiting the Act's applicability to the post-charge phases of a prosecution, courts would be empowered to issue injunctions requiring (for instance) consultation with victims before raids, warrant applications, arrests, witness interviews, lineups, and interrogations. That would work an extraordinary expansion of an already-extraordinary statute.

The intrusion occasioned by a pre-charge interpretation of the CVRA would also be qualitatively different. The commencement of criminal proceedings marks a sensible boundary on the prosecutorial-discretion spectrum. As already explained, before charges are filed—when the government is still in the process of investigating and deciding "whether to prosecute"—its authority and discretion are

47

understood to "exclusive" and "absolute." *Nixon*, 418 U.S. at 693. By contrast, once the charging decision is made, the prosecutor steps into the court's jurisdiction—its "house," to speak—and thus necessarily cedes some of her control of the course and management of the case. From that point forward, the court will "assume a more active role in administering adjudication of a defendant's guilt and determining the appropriate sentence." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 737 (D.C. Cir. 2016). Interpreting the CVRA to apply post-charge—as its terms plainly permit—thus squares with the background expectation of judicial involvement. Interpreting the Act to apply pre-charge, by contrast, contravenes the background expectation of executive exclusivity.[24]

\* \* \*

For reasons we have explained, we conclude that the CVRA is best understood—in accordance with its terms and the context in which it was

---

[24] For at least two reasons, it is no answer to say, as the district court did, that the CVRA would entitle movants only to a "voice" in a prosecutor's pre-charge decisionmaking process, not a "veto" over the decisions themselves—or, as the dissent does, that "nothing in the CVRA empowers crime victims to force a prosecutor to prosecute." Dissenting Op. at 63. First, giving movants even a guaranteed right under § 3771(a)(5) to "confer" with government actors before detection- and investigation-phase activities like raids, warrant applications, and interrogations could severely impact law-enforcement and prosecutorial decisionmaking. Second, there is essentially no limit to the sorts of pre-charge relief that an enterprising movant could seek—or that an innovative judge might grant—under § 3771(a)(8)'s fair-treatment provision. While perhaps not likely, it is not outside the realm of possibility that an alleged victim might argue—or that a district court might conclude—that the only "fair" thing to do in a particular circumstance would be to require the government to indict a suspect, or to charge him in a particular manner.

enacted—to apply only after the initiation of criminal proceedings. To the extent the Act's language and structure leave any doubt about its proper scope, we must assume that Congress "acted against the backdrop of long-settled understandings about the independence of the Executive with regard to charging decisions." *Fokker Servs.*, 818 F.3d at 738. Had Congress intended to upend (rather than reinforce) those "long-settled understandings," we can only assume it would have expressed itself more clearly. *See, e.g.*, *Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938, 1947 (2016) ("Congress 'does not, one might say, hide elephants in mouseholes.'" (quoting *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001))).[25]

---

[25] The dissent relies heavily on the Fifth Circuit's decision in *In re Dean*, 527 F.3d 391 (5th Cir. 2008), which it says "held" that "[t]here are clearly rights under the CVRA that apply before any prosecution is underway." Dissenting Op. at 103 (quoting *Dean*, 527 F.3d at 394). To the extent that *Dean* is properly read to "h[o]ld" that CVRA rights apply before the commencement of criminal proceedings—which we doubt, for reasons we will explain—we disagree with and decline to follow it. In that case, following an explosion at an oil refinery that killed 15 people and injured more than 170, the Department of Justice considered prosecuting the owner. Before bringing any charges, though, prosecutors filed an *ex parte* motion in the district court (1) alerting the court that a plea agreement was forthcoming and (2) asking the court's permission to delay notifying known victims until after the agreement was executed, for fear that pre-plea notification would be impracticable and could jeopardize the plea-negotiation process. The district court agreed, the plea agreement was signed, and the victims were notified thereafter. Several victims subsequently moved to appear and urged the district court to reject the plea agreement on the ground that, by maintaining secrecy, prosecutors (and the court) had violated their CVRA-based "reasonable right to confer with the attorney for the Government." 18 U.S.C. § 3771(a)(5). When the district court refused to reject the plea agreement, the victims sought mandamus relief from the court of appeals.

Although the Fifth Circuit ultimately declined to issue the writ, it observed—in what, given its ultimate disposition, was technically dictum—that the district court had violated the CVRA by acceding to the government's request that victims not be notified in advance of the plea deal. In so doing, it noted the district court's "acknowledg[ment]" that "[t]here are clearly

49

# V

For the foregoing reasons, we hold that the CVRA does not apply before the commencement of criminal proceedings—and thus, on the facts of this case, does not provide the petitioner here any judicially enforceable rights.

Having so held, two final words.

***First***, regarding the dissent:  Although we have endeavored along the way to meet a few of the dissent's specific critiques, we must offer here two more global responses.  As an initial matter, with respect to the dissent's charge (Dissenting Op. at 65) that we have "dresse[d] up" what it calls a "flawed statutory analysis" with "rhetorical flourish"—well, readers can judge for themselves whose rhetoric is in fact more florid.  *See, e.g.*, *id*. at 61 ("So how does the Majority bail the U.S. Attorney's Office out of its egregious CVRA violations . . . ?"); *id*. at 94 ("So how

---

rights under the CVRA that apply before any prosecution is underway."  527 F.3d at 394.  "Logically," the court of appeals said, "this includes the CVRA's establishment of victims' 'reasonable right to confer with the attorney for the Government.'"  *Id*. (quoting 18 U.S.C. § 3771(a)(5)).  Thus, the Fifth Circuit noted, "[a]t least in the posture of this case (and we do not speculate on the applicability to other situations), the government should have fashioned a reasonable way to inform the victims of the likelihood of criminal charges and to ascertain the victims' views on the possible details of a plea bargain."  *Id*.

We decline to follow *Dean*'s dictum for several reasons.  First, the *Dean* briefing reveals that the parties there didn't even dispute whether the CVRA applies before the commencement of criminal proceedings; accordingly, the question that this case so clearly tees up was never subjected to adversarial testing.  Second, and perhaps relatedly, the Fifth Circuit's three-sentence discussion—which does little more than echo the district court's own "acknowledg[ment]"—is devoid of any analysis of the CVRA's text, history, or structural underpinnings.  Finally, even read for all it might be worth, the Fifth Circuit's observation that the CVRA applied pre-charge in the circumstances before the court there was—for reasons we have explained at length and in detail, and with all due respect—simply incorrect.

50

in the holy name of plain text . . . ?"); *id*. ("The Majority hacks away at the plain

text with four tools."); *id*. ("The Majority cherry picks the meaning of

'case' . . . ."); *id*. at 96 ("Nonsense."); *id*. at 98 ("As its third tool to axe the plain

text . . . ."); *id*. ("Do not fall for this."); *id*. 106 (accusing us of ruling "by judicial

fiat"); *id*. at 109–10 (twice accusing us of fearing crime victims more than

"wealthy defendants").

More substantively, it remains unclear to us exactly how the dissent thinks

the CVRA should be interpreted and applied.  It's obvious that our dissenting

colleague doesn't particularly like our reading—namely, that CVRA rights don't

attach before the initiation of criminal proceedings.  (Which is fine—as we've

already confessed, we don't particularly *like* it either.)  But she offers no

intelligible alternative of her own.  At times, the dissent suggests—broadly, but

without elaboration—that the Act should be construed to apply "pre-charge."  *See*

Dissenting Op. at 67, 90, 95 n.19, 96–97, 104, 106, 109, 112.  That reading (while

we think wrong) at least has the benefit of coherence and clarity.  But the dissent

(we think wisely) doesn't seem eager to defend so sweeping an interpretation,

presumably because it has no logical stopping point.  Instead, the dissent hints—

although again, without any real explanation—that CVRA rights should be

understood to apply only (or at least?) "once the criminal case has matured to plea

51

negotiations." *Id*. at 96.[26]  Where, though—or as our dissenting colleague would say, where "in the holy name of plain text"—does that limiting criterion come from?  As best we can tell, it is devised specifically to capture this case without risking a landslide.  For reasons we have explained in detail, we believe that the CVRA is most properly (if imperfectly) read to apply only after the commencement of criminal proceedings.  One thing of which we are certain: That interpretation is far superior to the dissent's good-for-this-train-only, once-the-investigation-has-matured reading—which, so far as we can tell, has no meaningful footing in the Act's text, history, or structure.

*Second*, and far more importantly, regarding the consequences of our interpretation: It isn't lost on us that our decision leaves petitioner and others like her largely emptyhanded, and we sincerely regret that.  Under our reading, the CVRA will not prevent federal prosecutors from negotiating "secret" plea and non-prosecution agreements, without ever notifying or conferring with victims, provided that they do so before instituting criminal proceedings.  We can only

---

[26] *Accord, e.g.*, *id*. at 66–67 (insisting that "[t]his case is not about the start or middle stages of a criminal investigation" but, rather, "a completed investigation" and prosecutors' preliminary "deci[sion] to proceed with an indictment"); *id*. at 69 ("The prosecutors were prepared to indict Epstein."); *id*. at 70 ("[P]rosecutors were recommending and ready to proceed with the federal indictment of Epstein."); *id*. at 97 (asserting that the right to confer attaches "[o]nce an investigation is completed, the case has matured to the indictment-drafting stage and pre-charge plea negotiations with defense counsel have begun"); *id*. at 111 (contending that prosecutors had an obligation to confer here "given the investigation was completed, the 53-page indictment was drafted, and the prosecutor[s were] already conducting pre-charge plea negotiations with Epstein's defense team").

hope that in light of the protections provided by other statutes—and even more so in the wake of the public outcry over federal prosecutors' handling of the Epstein case—*they will not do so*.

The question before us, though, isn't whether prosecutors should have consulted with petitioner (and other victims) before negotiating and executing Epstein's NPA. It seems obvious to us—and, indeed, the government has expressly conceded—that they should have. Our sole charge is to determine, on the facts before us, whether the CVRA obligated prosecutors to do so. We simply cannot say that it did.

**PETITION DENIED.**

TJOFLAT, Circuit Judge, concurring:

I concur without reservation in Judge Newsom's opinion for the Court.  I write separately because the model the dissent creates, in which a victim is permitted to sue the United States Attorney[1] for refusing to confer about a criminal matter prior to indictment, would, in operation, result in Judicial Branch interference with the Executive Branch's function of investigating and prosecuting federal crimes.  Such a model raises serious questions about whether, by doing so, the judiciary would be violating the constitutional principle of separation of powers.[2]

There can be no doubt that the Executive Branch has exclusive power over prosecutorial decisions.  *See United States v. Nixon*, 418 U.S. 683, 693, 94 S. Ct. 3090, 3100 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case . . . ."); *Confiscation Cases*, 74 U.S. 454, 457 (1868) ("Public prosecutions, until they come before the court to which they are returnable, are within the exclusive direction of the district attorney . . . ."); *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S. Ct. 1649, 1656

---

[1] I refer to the U.S. Attorney here and throughout this opinion for ease of analysis.  Of course, in the typical case, the victim would sue the specific attorney in charge of the criminal investigation.

[2] This case presents an atypical CVRA scenario.  In the ensuing discussion, I explain how the dissent's interpretation of the statute would likely be applied in a typical case, in which the U.S. Attorney's Office is considering whether to impanel a grand jury to hear evidence indicating that an individual may have committed a criminal offense against another individual and caused the latter to suffer an injury.

(1985) ("[T]he decision of a prosecutor in the Executive Branch not to indict . . . has long been regarded as [within] the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const., Art. II, § 3)).  This Executive Branch authority obviously includes the decision to investigate suspected criminal activity and whether to seek, or not seek, an indictment from the grand jury.  These pre-charge decisions are the focus of this case.

The dissent interprets the CVRA as authorizing a victim to bring a U.S. Attorney to court for refusing to confer with her about a matter under criminal investigation.  To illustrate what would likely occur if we permitted the victim to do that—i.e., to envision how the dissent's interpretation of the CVRA would operate in practice—consider a simple case of mail fraud.

Jane Doe is the victim of a fraudulent scheme.  She finds out that the U.S. Attorney's Office is investigating the scheme and wants to discuss it with the attorney handling the investigation.  The attorney refuses her request, so she sues him.  Applying the dissent's interpretation, the district court finds that the attorney violated the CVRA by failing to confer with the victim.  The court issues an injunction requiring the attorney to confer with Doe and to treat her fairly.[3]  Even

---

[3] Another problem with the dissent's interpretation is that such an injunction could not be crafted in compliance with Rule 65 of the Federal Rules of Civil Procedure.  Under that rule, the

if the court could craft such an injunction to comply with Rule 65 of the Federal Rules of Civil Procedure, which I doubt, the court would then be continually involved in the criminal investigation from the moment it issued the injunction. At any moment during the inevitable twists and turns of a pre-indictment criminal investigation, the victim could allege that the attorney had violated the injunction, and the attorney would be back in front of the district court to show cause why he should not be held in contempt.[4]  But the event most likely to trigger such a hearing is the attorney's decision not to take the case to the grand jury, and that decision is completely within the Executive Branch's prosecutorial discretion. Therefore, applying the dissent's interpretation of the CVRA would clearly interfere with the Executive Branch's investigative and prosecutorial functions.

---

order must be "specific" and "describe in reasonable detail . . . the act . . . required." Fed. R. Civ. P. 65(d)(1)(b)–(c).  These requirements serve three purposes.

First, they provide notice to the enjoined party of precisely what it must do to avoid being held in contempt—the party cannot be left guessing.  Second, a specific and reasonably detailed order is easy to enforce, while a vague order is not.  Third, an injunction that does not meet these requirements breeds disrespect for the courts and the rule of law.

In cases like this one, an injunction requiring the attorney to confer with the victim and treat her fairly could not meet Rule 65's requirements.  In my hypothetical, "conferral" and "fairness" likely would mean different things to the attorney and Doe, meaning the parties would be left guessing about what the injunction required.  Therefore, such an injunction would not comply with Rule 65.  To make matters worse, failure to comply with Rule 65 would exacerbate the problem discussed below—specifically, excessive judicial interference with an ongoing investigation—because the district court would frequently need to oversee disputes about whether the attorney's handling of the investigation was violating the inherently vague injunction.

[4] Moreover, and perhaps worst of all, there is nothing stopping a victim from challenging the attorney's decisions at multiple steps along the way.  Once the district court is involved, a victim could allege that the attorney did not confer with her, or did not treat her fairly, whenever he makes each new investigatory or prosecutorial decision.

56

Having explored the consequences of the dissent's interpretation of the CVRA, it is clear that such an interpretation cannot be accepted. The notion that a district court could have any input on a U.S. Attorney's investigation and decision whether to bring a case to the grand jury is entirely incompatible with the constitutional assignment to the Executive Branch of exclusive power over prosecutorial decisions. Additionally, it is hard to imagine a bigger intrusion on executive autonomy than the possibility that a U.S. Attorney will be held in contempt for violating an injunction if her investigation is not handled as the victim and district court see fit. Therefore, the dissent's interpretation raises serious constitutional issues by concluding that there are no temporal limitations on the CVRA rights to confer with, and to be treated fairly by, the U.S. Attorney.[5]

In contrast, under Judge Newsom's interpretation, this problem does not exist because the CVRA only gives victim's post-charge rights. And, post-charge, the district court is not dragging the U.S. Attorney into court against his will and

_____

[5] The dissenting opinion asserts that it "in no way injects judicial interference into a prosecutor's decisions" because "[t]he fact that a prosecutor must confer with a victim pre-charge does not mean the district court can exercise any control over the prosecutor's ultimate decision whether to indict." Dis. Op. at 113. But this is clearly wrong based on the facts of this case—prosecutors chose to enter an NPA with Epstein, and the victim wants the Court to undo that agreement. My dissenting colleague would likely argue that, because the U.S. Attorney could re-enter an NPA with Epstein's co-conspirators after conferring with victims, forcing the U.S. Attorney to confer would not invade the executive's prosecutorial discretion. This riposte overlooks the reality that exclusive discretion does not come with caveats. In other words, imposing the dissent's conditions that the executive must satisfy before it can exercise its prosecutorial discretion means that it does not truly have exclusive discretion.

57

imposing a condition upon his prosecutorial discretion—the attorney is voluntarily before the court, and it is appropriate for the court, in its active role in the criminal proceedings, to examine the attorney's failure to comply with his CVRA obligations. In such circumstances, there is no concern about the separation of powers because the court is not meddling in the Executive Branch's decisions until executive officers have chosen to present themselves to the court.

In sum, the dissent's interpretation creates serious constitutional concerns that Judge Newsom's interpretation does not. And it is "settled policy" that, when confronted with two potential interpretations of a statute, we should avoid the interpretation that "engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *See Gomez v. United States*, 490 U.S. 858, 864, 109 S. Ct. 2237, 2241 (1989). Therefore, Judge Newsom's interpretation should be adopted. This conclusion is bolstered by the language of the statute, itself, which explicitly states that none of the CVRA's provisions should be read to diminish prosecutorial discretion: "Nothing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6). Clearly, the author of the

statute—Congress—recognized the need to avoid any construction that results in the problem that the dissent's approach creates.[6]

For all of the reasons set forth in Judge Newsom's opinion, and because such an interpretation avoids raising serious constitutional questions, the CVRA is best understood as not applying until charges are commenced against a defendant.

---

[6] Putting aside the separation of powers problem, under the dissent's approach, the judiciary, based on Congressional authority in the form of a statute, appears to be putting its thumb on the scale against the individuals being investigated by law enforcement. In a sense, the judiciary is telling the executive that it had better indict its suspects or potentially face a CVRA action. But the only time that it is appropriate for the judiciary to do so, based on Congressional authority, is during criminal sentencing, where sufficient due process safeguards are in place to protect the accused's constitutional rights. Because such safeguards are obviously not in place pre-charge, this effect of the dissent's interpretation is another reason not to adopt it.

HULL, Circuit Judge, dissenting:

This appeal presents legal questions of first impression in this Circuit regarding the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, which grants a statutory "bill of rights" to crime victims.  In my view, the Majority patently errs in holding, as a matter of law, that the crime victims of Jeffrey Epstein and his co-conspirators had no statutory rights whatsoever under the CVRA.  Instead, our Court should enforce the plain and unambiguous text of the CVRA and hold that the victims had two CVRA rights—the right to confer with the government's attorney and the right to be treated fairly—that were repeatedly violated by the U.S. Attorney's Office in the Southern District of Florida.[1]

Here, the U.S. Attorney's Office (1) drafted a 53-page indictment against sex trafficker and child abuser Epstein and (2) repeatedly wrote his defense team that the government had proof beyond a reasonable doubt that he victimized more than 30 women as minors.  Shockingly though, the Office then (1) conducted many days of extensive plea negotiations with Epstein's attorneys and secretly entered into a Non-Prosecution Agreement ("NPA"), granting Epstein federal immunity in return for his plea to two state prostitution-solicitation charges, (2) never conferred one minute with the victims about the NPA or told the victims that such an

---

[1]Federal prosecutors located in the U.S. Attorney's Offices in both West Palm Beach and Miami handled Epstein's case.  I will refer to those offices collectively as "the U.S. Attorney's Office" or "the Office."

agreement was under consideration, (3) worked closely with Epstein's lawyers to keep the NPA's existence and terms hidden from the victims, (4) actively misrepresented to the victims that the criminal investigation continued when the NPA was already signed, and (5) never informed the victims about the NPA until after Epstein pled guilty in State Court and the secret sweetheart deal was done.

Remarkably too, without notice and conferral with the victims, the NPA granted federal immunity not only to Epstein, but also to "any potential co-conspirator of Epstein, including but not limited to Sarah Kellen, Adriana Ross, Lesley Groff, or Nadia Marcinkova." It is only because the victims filed this lawsuit, and the District Court ordered the NPA be produced, that the victims and the public learned the truth about the plea negotiations and the NPA's grant of federal immunity to Epstein and his co-conspirators.

So how does the Majority bail the U.S. Attorney's Office out of its egregious CVRA violations and reverse the District Court's ruling? The Majority holds that Epstein's crime victims had no CVRA rights at all because the plea negotiations with Epstein's defense counsel were conducted "pre-charge" and the Office never filed the indictment and commenced court proceedings. That is to say, the Majority crafts a bright-line, blanket restriction on the statute: the CVRA grants crime victims no rights whatsoever <u>unless and until</u> a formal indictment is filed in a court. See Maj. Op. at 2.

61

The Majority concludes "the CVRA was never triggered" at all, even though the U.S. Attorney's Office prepared a 53-page indictment against Epstein but later secretly entered into a plea deal, granting federal immunity to Epstein and his co-conspirators.  Id.  According to the Majority, because the Office cleverly entered into a sweetheart plea deal with Epstein "pre-charge" and never filed the indictment, the victims never had any CVRA rights in the first place.  Id. at 2, 18-19.[2]

I dissent because the plain and unambiguous text of the CVRA does not include this post-indictment temporal restriction that the Majority adds to the statute.  Although, as I discuss later, the two rights provisions at issue include other limiting principles, there is no textual basis for the bright-line, post-indictment only restriction the Majority adds to the statute.  Rather, the Majority's contorted statutory interpretation materially revises the statute's plain text and guts victims' rights under the CVRA.  Nothing, and I mean nothing, in the CVRA's plain text requires the Majority's result.

See for yourself.  The CVRA grants "crime victims" these two unambiguous rights in subsection (a):

---

[2]The Majority holds that "the rights under the Act do not attach until criminal proceedings have been initiated against a defendant, either by complaint, information, or indictment."  See Maj. Op. at 2.  But for ease of reference in my dissent, I collectively refer to the initiation of criminal proceedings as by "filing an indictment" because most prosecutions begin that way.  In contrast, a "complaint" can initiate only misdemeanor prosecutions and an "information" can initiate felony charges only if the defendant waives grand jury presentment.

> **(a) Rights of crime victims.**—A crime victim has the following rights:
>
> . . . .
>
> **(5)** The reasonable right to confer with the attorney for the Government in the case.
>
> . . . .
>
> **(8)** The right to be treated with fairness and with respect for the victim's dignity and privacy.

18 U.S.C. § 3771(a)(5), (8).  The text does not contain the Majority's post-indictment temporal restriction.  Simply put, crime victims do not have to wait for the government to file a formal indictment and commence court proceedings before having these CVRA rights.

In fact, the CVRA's venue provision in § 3771(d) expressly provides that, "if no prosecution is underway," the victims can file suit to assert their subsection (a) rights "in the district court in the district in which the crime occurred."  Id. § 3771(d)(1), (3).  In filing this lawsuit back in 2008, the petitioner crime victims did what the CVRA expressly authorized them to do.

To be clear, nothing in the CVRA empowers crime victims to force a prosecutor to prosecute.  See id. § 3771(d)(6).  As the Concurring Opinion well points out, the Executive Branch has exclusive authority and absolute discretion over prosecutorial decisions and whether to seek indictment or not.  Conc. Op. at 54-55.  But what the CVRA does do is grant victims a statutory right to have an opportunity to speak to the prosecutor before the prosecutor makes that decision.  In § 3771(c), the CVRA even mandates that the U.S. Attorney's prosecutors, while

"engaged in the . . . investigation[] or prosecution of crime shall make their best efforts" to accord victims these statutory rights in subsection (a). Id. § 3771(c)(1). After conferral, the prosecutor has the exclusive authority and discretion whether to indict or not. Pre-charge, the Office spent days conferring and negotiating with Epstein's defense team, but had not a minute for the victims.

Unlike the Majority, I agree with the Fifth Circuit that crime victims have a CVRA right to confer with the government attorney, even if a plea deal is struck before any formal indictment is filed. See In re Dean, 527 F.3d 391, 394 (5th Cir. 2008). As the Fifth Circuit emphasized: "In passing the Act, Congress made the policy decision—which we are bound to enforce—that the victims have a right to inform the plea negotiations process by conferring with prosecutors before a plea agreement is reached." Id. at 395.

What's worse is that the Majority concedes, as it must, that § 3771(a)(5)'s conferral right and § 3771(a)(8)'s right to be treated with fairness have no temporal limitation on their face and that petitioners are "not without [their] own textual arguments." Maj. Op. at 20, 25, 29. The Majority admits: "The interpretation of the CVRA that petitioner advances, and that the district court adopted, is not implausible; the CVRA could be read to apply pre-charge." Id. at 18. Yet, the Majority refuses to enforce the Act as written by Congress and grafts onto the plain and unambiguous text a restriction Congress never enacted.

64

The roadmap for my dissent follows. First, I recount more facts about the undisputed conduct of the U.S. Attorney's Office. This includes how initially the Office wrote the victims, and later Epstein's attorneys, that the victims had ongoing CVRA rights to confer and be treated fairly. Tellingly, it was not until the petitioner victims filed this lawsuit that the Office reversed course and took the stance that the victims never had any CVRA rights in the first place.

Next, I examine the CVRA text and apply the relevant canons of statutory interpretation. Then, I show the flaws in the Majority's statutory analysis. In one breath, the Majority urges Congress to fill the gap left by (the Majority's reading of) the CVRA and in the next tells us why granting victims two CVRA rights "pre-charge" would be a bad idea.

Given this is a plain-text case, the Majority curiously carries on at length about slippery slopes and bad policy implications that the Majority says counsel against enforcing any victim rights "pre-charge." Yet, since the Fifth Circuit's 2008 decision and the District Court's 2011 decision, there has been no flood of civil suits by victims, no evidence of victims' abuse of their CVRA rights, and no prosecutors' complaints about impairment of their prosecutorial discretion.

The Majority also dresses up its flawed statutory analysis with rhetorical flourish, using language like "scandalous," "national disgrace," and "the sad details of this shameful story," while also expressing sincere empathy for the victims:

65

"Despite our sympathy for Ms. Wild and others like her, who suffered unspeakable horror at Epstein's hands, only to be left in the dark—and, so it seems, affirmatively misled—by government lawyers, we find ourselves constrained to deny her petition." Maj. Op. at 2, 6. The Majority confesses that "[i]t isn't lost on us that our decision leaves petitioner and others like her largely emptyhanded" and "we sincerely regret that." Id. at 52. In addition to ruminating in sincere regret and sympathy, we, as federal judges, should also enforce the plain text of the CVRA—which we are bound to do—and ensure that these crime victims have the CVRA rights that Congress has granted them.

Next, I address the constitutional concerns about the CVRA raised in the Concurring Opinion, although that, so far, has not been the issue in this appeal. Lastly, I address the remedy and why, due to the U.S. Attorney's Office's egregious violations of the victims' rights, this Court should remand the case to the District Court for consideration of the victims' requested remedies.

## I.  PROSECUTORS ADVISE VICTIMS HAVE CVRA RIGHTS

This case is not about the start or middle stages of a criminal investigation. Rather, as detailed below, this case is about (1) a completed investigation of federal sex-trafficking crimes against minor girls and (2) the U.S. Attorney's Office's repeated communications that it (a) had "proof beyond a reasonable doubt" that over 30 minor girls were victims of Epstein's criminal sexual conduct

66

and (b) had "decided to proceed with [Epstein's] indictment."  Let's start with the investigation and how the Office in 2006 wrote the victims that they did have CVRA rights pre-charge.

## A.  2005 – 2007 Criminal Investigation

In 2005, the parents of a 14-year-old girl reported to the Palm Beach Police Department that Jeffrey Epstein sexually abused their daughter.  This report began the investigation into the then 52-year-old billionaire Jeffrey Epstein—an investigation that ultimately revealed that Epstein assembled a network of underage girls whom he sexually abused at his mansion in Palm Beach, Florida, elsewhere in the United States, and overseas.

In 2006, at the Palm Beach Police Department's request, the Federal Bureau of Investigation ("FBI") opened a federal investigation into Epstein's and his personal assistants' use of facilities of interstate commerce to induce girls between the ages of 14 and 17 to engage in illegal sexual activities.  Thereafter, the U.S. Attorney's Office accepted the case for prosecution and assigned specific federal prosecutors to the case.

The FBI established that Epstein used young female recruiters and paid employees to find and bring minor girls to him, as often as three times a day, for his own and others' sexual gratification.  Epstein also directed other people to sexually abuse the minor girls, including his co-conspirator Nadia Marcinkova.

67

This in-depth federal investigation proved that, between 2001 and 2007, Epstein sexually abused more than 30 minor girls, and multiple co-conspirators either procured the girls for Epstein's sexual gratification or participated in the sexual abuse themselves. The victims include the petitioners in this case, Jane Doe 1 and Jane Doe 2, who were 15 years old when first sexually abused by Epstein.

**B. Aug. 2006 Letter to Crime Victim about CVRA Rights**

Throughout the two-year investigation, once a victim of Epstein's sexual abuse was identified, the lead Assistant U.S. Attorney ("AUSA") assigned to the case, A. Marie Villafana, sent a letter telling the victim that she was protected by the CVRA and explaining her statutory rights under the CVRA.

For example, in 2006 and before an indictment was drafted in 2007, the U.S. Attorney's Office told petitioner Jane Doe 2 in a letter that she had statutory rights "to confer with the attorney for the Government in the case," "to be treated with fairness," and to petition the District Court if her CVRA rights were being violated. See 18 U.S.C. § 3771(a), (d)(3). The Office's 2006 letter explained that the Department of Justice would make its "best efforts" to ensure Jane Doe 2's CVRA rights were protected. Later, in March 2007, the Office began sending similar letters to Epstein's other victims, informing them of their ongoing CVRA rights.

This initial position of the U.S. Attorney's Office—that the petitioners had ongoing CVRA rights—is not surprising given that the CVRA was enacted to

68

protect crime victims' rights and ensure their involvement in the criminal justice process.  United States v. Moussaoui, 483 F.3d 220, 234 (4th Cir. 2007); Kenna v. U.S. Dist. Court, 435 F.3d 1011, 1016 (9th Cir. 2006) ("The [CVRA] was enacted to make crime victims full participants in the criminal justice system.").

## II.  MAY 2007: FEDERAL INDICTMENT PREPARED

By May 2007, the U.S. Attorney's Office had completed an 82-page prosecution memo and a 53-page draft indictment against Epstein, charging him with numerous federal crimes of sex trafficking minor victims.  The prosecutors were prepared to indict Epstein.  For the victims, so far, so good.  But what the victims didn't know is what was secretly going on behind the scenes.

## III.  JAN. – SEPT. 2007: PROSECUTORS NEGOTIATE WITH EPSTEIN

Meanwhile and unbeknownst to the victims, for over nine months in 2007 (from January to September), the U.S. Attorney's Office was discussing with Epstein's defense team the forthcoming federal criminal charges.  During this time, Epstein's defense team made multiple presentations to the Office to try to convince them not to prosecute Epstein, maintaining he committed no federal crimes.[3]

---

[3]Jeffrey Epstein's defense team included at various times attorneys from multiple law firms, such as: (1) Jay P. Lefkowitz, Kirkland & Ellis, New York, NY; (2) Roy Black, Black Srebnick Kornspan & Stumpf, Miami, FL; (3) Gerald B. Lefcourt, Law Office of Gerald B. Lefcourt, P.C., New York, NY (4) Lilly Ann Sanchez, Fowler White Burnett, Miami, FL; (5) Jack A. Goldberger, Goldberger & Weiss, West Palm Beach, FL; and (6) Joe D. Whitley, Alston & Bird, Washington D.C.; as well as Harvard Law Professor Alan Dershowitz.  While not all attorneys participated in each defense presentation, the record here reveals some activity by each of Epstein's defense attorneys during either 2007 or 2008.

Those defense presentations were not successful.  The record contains extensive communications showing that, as of August 2007, the Office's prosecutors were recommending and ready to proceed with the federal indictment of Epstein.

In early September 2007, U.S. Attorney R. Alexander Acosta met with some of Epstein's defense team, along with the federal prosecutors assigned to Epstein's case and the Chief of the Child Exploitation and Obscenity Section of the Department of Justice's Criminal Division in Washington, D.C.  Epstein's defense team again raised federalism-based arguments that were rejected.  As U.S. Attorney Acosta explained, "[a]fter considering the arguments raised at the September 7th meeting, and after conferring with the FBI and with [the Chief of the Child Exploitation and Obscenity Section], our Office decided to proceed with the indictment."  At that time, the State of Florida had already charged Epstein with one count of solicitation of prostitution.

## IV.  NON-PROSECUTION AGREEMENT

What happened next remains baffling, to put it mildly.  During September 2007, Epstein's defense attorneys engaged in more intensive pre-indictment plea negotiations with the U.S. Attorney's Office.

Although the record does not explain why, the Office then took the position that two types of plea agreements could apply to Epstein's federal crimes: (1) a plea agreement to federal charges; or (2) a non-prosecution agreement, whereby

70

the Office would agree not to federally prosecute Epstein and his co-conspirators, in return for which Epstein would plead guilty to a mere two state prostitution-solicitation charges and agree to an 18-month sentence in the county jail.

On September 16, 2007, Epstein's counsel Jay Lefkowitz sent the U.S. Attorney's Office a proposed written agreement, wherein the Office would extend immunity from federal prosecution to Epstein and certain co-conspirators.[4]  The next day, Epstein's counsel Lefkowitz followed up, asking if the Office "intend[ed] to make the deferred prosecution agreement public," should Epstein agree to "go that route."  AUSA Villafana responded: "A non-prosecution agreement would not be made public or filed with the Court, but it would remain part of our case file.  It probably would be subject to a FOIA request, but it is not something that we would distribute without compulsory process."

The victims were not told that plea negotiations were ongoing, much less that the Office was seriously considering a non-prosecution agreement granting federal immunity to Epstein and his co-conspirators.  Rather, the parties made great efforts to keep that secret from the victims and the public, too.

---

[4]In an e-mail to Lefkowitz, dated September 16, 2007, AUSA Villafana suggested strategies to conceal portions of the plea deal from the courts, stating that a prosecutor had "recommended that some of the timing issues be addressed only in the state agreement, so that it isn't obvious to the judge that we are trying to create federal jurisdiction for prison purposes." AUSA Villafana added: "I will include our standard language regarding resolving all criminal liability and I will mention 'co-conspirators,' but I would prefer not to highlight for the judge all of the other crimes and all of the other persons that we could charge."

71

## A.  Sept. 24, 2007: Execution and Terms of NPA

On September 24, 2007, the U.S. Attorney's Office and Jeffrey Epstein signed a seven-page agreement, entitled the "Non-Prosecution Agreement."[5]  The NPA provided that the Office would not prosecute Epstein or his co-conspirators in the Southern District of Florida for federal felony crimes of sex trafficking more than 30 minors if: (1) Epstein pled guilty in Florida State Court to two state prostitution-solicitation charges, and (2) Epstein made a binding recommendation that the State Court impose an 18-month sentence in the county jail.  The crimes listed in the NPA were: (1) sex trafficking of minors by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591(a)(1) and 2; (2) conspiracy to travel and traveling in interstate commerce for the purpose of engaging in illicit sexual conduct with minor females, in violation of 18 U.S.C. § 2423(b), (e), and (f); and (3) conspiracy to use and using means of interstate commerce to knowingly persuade, induce, or entice minor females to engage in prostitution, in violation of 18 U.S.C. §§ 2422(b) and 371.

---

[5]The only four signature lines on the September 24, 2007 NPA were: (1) U.S. Attorney Acosta by AUSA Villafana; (2) Jeffrey Epstein; (3) Gerald Lefcourt, Counsel to Jeffrey Epstein; and (4) Lilly Ann Sanchez, Attorney for Jeffrey Epstein.  From June 2005 to June 2009, Acosta was the U.S. Attorney for the Southern District of Florida.

As for the victims, the NPA added insult to injury.  The NPA provided that

if and only if the victims agreed to waive any other claim for damages, the victims

could obtain an attorney paid for by Epstein and file 18 U.S.C. § 2255 civil

lawsuits against Epstein for restitution.  Of course, restitution in a criminal case is

not contingent upon a victim giving up rights to pursue damages claims.

Even more striking, the NPA extended immunity to any "potential co-

conspirator" of Epstein's, stating: "In consideration of Epstein's agreement to

plead guilty and to provide compensation in the manner described above, . . . the

United States also agrees that it will not institute any criminal charges against any

potential co-conspirators of Epstein, including but not limited to Sarah Kellen,

Adriana Ross, Lesley Groff, or Nadia Marcinkova."[6]  Apparently, the co-

conspirators had not cooperated or assisted the government.  Rather, the sole

consideration for their federal immunity was that Epstein plead to two state

charges and provide potential restitution to his victims, but only if the victims

waived all damages claims against Epstein.  The NPA even stated "that this

agreement will not be made part of any public record."[7]

---

[6]At oral argument in this appeal, counsel for the respondent U.S. Attorney's Office agreed that it was highly unusual—never seen before—that the government would extend federal immunity to Epstein's co-conspirators without having the co-conspirators sign onto a plea agreement or provide some cooperation in exchange for federal immunity.  The co-conspirators did not sign the NPA and were not listed as parties to it.

[7]As the NPA was being signed, Epstein's attorney Lefkowitz e-mailed AUSA Villafana,

**B. Office Does Not Confer with Crime Victims**

Although the U.S. Attorney's Office accepted the case for prosecution and prepared a 53-page indictment, the Office never conferred with the victims about the NPA and never told the victims that such an agreement was being considered, much less being negotiated. While the Office spent untold hours negotiating the NPA's terms with Epstein's skilled defense team, the Office never told the victims that it was negotiating and signing an agreement that would grant federal immunity to Epstein and his co-conspirators. The Office kept this information from Epstein's victims, despite earlier having sent most, if not all, of the girls the CVRA letters, which advised that the victims had a "right to confer with the attorney for the United States in the case" and a "right to be treated with fairness."

## V. SEPT. 2007 – JULY 2008: PROSECUTORS HIDE NPA

The U.S. Attorney's Office also failed to tell the victims about the NPA for at least nine months after it was executed. Instead, the Office misrepresented to the victims that "this case" was still under investigation, advised them "to be patient," and never disclosed the government's NPA with Epstein.

---

requesting: "Marie—Please do whatever you can to keep this [NPA] from becoming public." AUSA Villafana assured Lefkowitz that the NPA would be kept confidential.

## A.  Prosecutors Negotiate With Defense about Notifying Victims

During that nine-month period, the U.S. Attorney's Office and Epstein's defense team negotiated whether and to what extent the victims would be told about the NPA's resolution of the federal case.  In this case, the Office admitted that it was a deviation from the government's standard practices to negotiate with defense counsel about the extent of crime victim notifications.  Nevertheless, Epstein's defense attorneys demanded that the victims not be told about the resolution of the federal case because otherwise Epstein "will have no control over what is communicated to the identified individuals [the victims] at this most critical stage."

Epstein, of course, did not want the victims to know there would be no federal prosecution of his sex-trafficking-of-minors crimes if he pled guilty in State Court to merely soliciting prostitution.  Everyone knew the victims would be disgusted, raise vigorous objections on the federal level, and try to convince the State Court judge not to be beguiled into accepting such a state plea that was tied to no federal prosecution for sex-trafficking crimes against more than 30 minor victims.  While his state plea did not happen until June 30, 2008, in the interim, Epstein's attorneys worked to keep the terms of the 2007 NPA secret until after Epstein's state plea was accepted and the deal was done.

75

In later correspondence with Epstein's attorneys, AUSA Villafana admitted that Epstein did not want the U.S. Attorney's Office to inform the State Attorney's Office of the facts supporting the additional state prostitution-solicitation charge, nor did Epstein want federal victims to contact the State Court or prosecutor because the state prosecutor's "opinion may change if she knows the full scope of [Epstein's] actions."  To this date, the U.S. Attorney's Office has presented no evidence that it or anyone else told the State Court, either before or during Epstein's state hearing, about the secret consideration Epstein had negotiated with the federal government—federal immunity for him and all co-conspirators—if the State Court accepted his state plea.[8]

Consistent with Epstein's demands, the U.S. Attorney's Office did not notify the victims about the NPA.  But before acquiescing, the manner in which the Office responded to Epstein's demands unmasks the truth.

---

[8]Epstein's defense team had legitimate concerns that the State Court judge would not accept Epstein's plea if tied to such a broad, secret federal immunity deal.  Under Florida law, a State trial judge is never bound to honor a negotiated plea agreement.  Goins v. State, 672 So. 2d 30, 31 (Fla. 1996).  During a plea colloquy, a trial judge may announce that she is not bound by the plea agreement because other factors make the trial judge's concurrence impossible.  King v. State, 578 So. 2d 23, 24 (Fla. Dist. Ct. App. 1991); see also Fla. R. Crim. P. 3.171(d) ("After an agreement on a plea has been reached, the trial judge may have made known to him or her the agreement and reasons therefor prior to the acceptance of the plea.  Thereafter, the judge shall advise the parties whether other factors (unknown at the time) may make his or her concurrence impossible.").  The NPA itself acknowledged that the entire deal was contingent on the State Court judge accepting the negotiated state plea agreement and sentence.

If the victims had been told the truth about the 2007 NPA, they would have had ample time to make their views known to the State Court before Epstein's plea on June 30, 2008.  If the State Court rejected the plea, there was no federal immunity for Epstein and his co-conspirators.

Initially, the Office responded that the government had <u>statutory obligations under the CVRA</u> to notify the victims of the NPA, to confer with the victims, and to tell them about upcoming events, such as Epstein's state plea in return for no federal prosecution. Here are examples of what the Office wrote Epstein's attorneys in November and early December of 2007:

- "The United States has a statutory obligation (Justice for All Act of 2004)[9] to notify the victims of the anticipated upcoming events and their rights associated with the agreement entered into by the United States and Mr. Epstein in a timely fashion."

- "Section 3771 . . . commands that 'employees of the Department of Justice . . . engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a).'"

- "Our Non-Prosecution Agreement resolves the federal investigation by allowing Mr. Epstein to plead to a state offense. The victims identified through the federal investigation should be appropriately informed, and our [NPA] does not require the U.S. Attorney's Office to forego its legal obligations."

- "[T]he Office believes that it has proof beyond a reasonable doubt that each listed individual was a victim of Mr. Epstein's criminal conduct while the victim was a minor. <u>The law requires us to treat all victims 'with fairness and with respect for the victim's dignity and privacy.'</u> 18 U.S.C. § 3771(a)(8). We will not include any language that demeans the harm they may have suffered."

- "[W]e will not remove the language about contacting AUSA Villafana or Special Agent Kuyrkendall with questions or concerns. <u>Again, federal law</u>

---

[9]The CVRA was enacted as part of the Justice for All Act of 2004, Pub. L. No. 108-405, § 102, 118 Stat. 2260 (codified as amended at 18 U.S.C. § 3771 (2015). As does the Majority, I quote the version of the CVRA in effect during the 2006 to 2008 events in question.

> requires that victims have a 'reasonable right to confer with the attorney for the Government in this case.' 18 U.S.C. § 3771(a)(5)."

The evidence shows the Office repeatedly told Epstein's attorneys that it had CVRA obligations to notify and confer with the victims about the NPA and upcoming events. As the state plea would resolve Epstein's federal sex-trafficking crimes, the CVRA, as well as basic decency and fairness, demanded the Office tell the victims of that critical fact and about the State Court proceeding.

Yet, on December 19, 2007, U.S. Attorney Acosta sent a letter to Epstein's counsel addressing "the issue of victim's rights pursuant to Section 3771." U.S. Attorney Acosta stated: "I understand that the defense objects to the victims being given notice of time and place of Mr. Epstein's state court sentencing hearing. . . . We intend to provide victims with notice of the federal resolution, as required by law. We will defer to the discretion of the State Attorney regarding whether he wishes to provide victims with notice of the state proceedings[.]" Despite U.S. Attorney Acosta representing that "[w]e intend to provide victims with notice of the federal resolution, as required by law," the Office never did that before Epstein pled guilty in State Court on June 30, 2008, and the deal was consummated.

## B. 2008 Victims Misled

Another chapter in this sordid story. Before going to State Court, Epstein apparently was not satisfied with his defense team's success in securing the highly

favorable NPA.  In January 2008, Epstein's attorneys sought higher-level review within the Justice Department.[10]  U.S. Attorney Acosta agreed to allow Epstein to delay further his State Court plea while his attorneys appealed to main Justice. This time Epstein's defense team got nowhere.

Nonetheless, during this review period, the U.S. Attorney's Office still did not tell the victims a signed NPA existed.  Instead, on January 10, 2008, the government sent Epstein's victims letters misrepresenting that "[t]his case is currently under investigation.  This can be a lengthy process and we request your continued patience while we conduct a thorough investigation."

Jane Doe 1's sworn testimony is revealing.  On January 31, 2008, Jane Doe 1 met with AUSA Villafana, FBI agents, and another federal prosecutor and provided additional details of Epstein's sexual abuse of her.  Jane Doe 1 said she hoped Epstein would be prosecuted and that she was willing to testify against him at trial.  Based on the earlier letters she received, Jane Doe 1 believed the federal prosecutors would contact her before reaching any final resolution.  During that meeting, however, the federal prosecutors and FBI agents still did not disclose to

---

[10]Epstein wanted one last shot at convincing the U.S. government that there was no basis for his federal criminal liability and he should not have to plead to anything.  Epstein's appeal was unsuccessful.  On June 23, 2008, the Office told Epstein's attorneys that the Deputy Attorney General had completed his review of the Epstein matter and "determined that federal prosecution of Mr. Epstein's case [wa]s appropriate."

Jane Doe 1 that the Office had signed the NPA, which barred Epstein's federal prosecution for sex-trafficking crimes against her.

The U.S. Attorney's Office continued to conceal the existence of the NPA from all the victims for months to come. In mid-June of 2008, Bradley Edwards, the Fort Lauderdale, Florida attorney for several of Epstein's victims, contacted AUSA Villafana to inform her that he represented Jane Doe 1 and, later, Jane Doe 2. AUSA Villafana and Edwards discussed the possibility of federal charges being filed against Epstein in the future. Edwards was led to believe that federal charges could still be filed by the Office, with AUSA Villafana failing to mention the NPA or any other possible resolution of Epstein's federal case.

## VI.  JUNE 30, 2008: EPSTEIN'S STATE PLEA

On June 30, 2008, Epstein pled guilty in Florida State Court to (1) solicitation of prostitution and (2) procuring a person under the age of 18 for prostitution. That same day, the State Court sentenced Epstein to 18 months' imprisonment in the county jail. As the Majority concedes, there is no indication that any of Epstein's victims were informed about the NPA or the terms of his state plea until later. Maj. Op. at 6.

Having still not been informed of the resolution of Epstein's federal case, on July 3, 2008, attorney Edwards sent a letter to the U.S. Attorney's Office communicating the victims' wishes that federal charges be filed against Epstein.

80

Attorney Edwards explained: "We urge you to move forward with the traditional indictments and criminal prosecution commensurate with the crimes Mr. Epstein has committed, and we further urge you to take the steps necessary to protect our children from this very dangerous sexual perpetrator."  Because Epstein was "a sexual addict that focused all of his free time on sexually abusing children," Edwards emphasized that "[f]uture abuse and victimization is obvious to anyone who really reviews the evidence in this case, and future sexual abuse of minors is inevitable unless [Epstein] is prosecuted, tried and appropriately sentenced."

## VII.  PROCEDURAL HISTORY

On July 7, 2008, Courtney Wild (proceeding as "Jane Doe 1") filed an emergency petition alleging that she was a victim of Epstein's federal crimes and that the U.S. Attorney's Office had violated her CVRA rights (1) to confer with federal prosecutors, (2) to be treated with fairness, (3) to receive timely notice of relevant court proceedings, and (4) to receive information about restitution.

Two days later, on July 9, 2008, the U.S. Attorney's Office responded, arguing for the first time, that the CVRA did not apply at all to pre-indictment plea negotiations with a potential federal defendant.  Once sued, the Office changed its position despite having earlier written the victims, and later Epstein's defense

81

team, that the victims had ongoing CVRA rights, and that the Office had statutory obligations to accord the victims those rights.[11]

It was only in the Office's July 9, 2008, responsive pleading that Jane Doe 1 first saw reference to the fact that, over nine months earlier in September 2007, the Office had signed an agreement with Epstein to not prosecute him for federal crimes if Epstein pled guilty to two state charges.

Also on July 9, 2008, the U.S. Attorney's Office sent short letters to petitioner Wild and Epstein's other victims stating: (1) "the United States . . . was prepared to name [each girl] in an Indictment as victims of an enumerated offense by Mr. Epstein"; but (2) the "United States has agreed to defer federal prosecution in favor of [Epstein's] state plea and sentence, subject to certain conditions."  That cursory notification still did not provide the full terms of the NPA, such as the provision extending federal immunity to Epstein's co-conspirators.[12]

---

[11]In a footnote, the Majority cites to a 2010 opinion by the Justice Department's Office of Legal Counsel ("OLC").  Maj. Op. at 37 n.20.  The Justice Department's 2010 OLC opinion, like the change of position by the Justice Department's local U.S. Attorney's Office, came only after Epstein's victims filed this lawsuit.  See Mohasco Corp. v. Silver, 447 U.S. 807, 825, 100 S. Ct. 2486, 2497 (1980) (holding that an agency's "'interpretation' of a statute cannot supersede the language chosen by Congress").

[12]The Majority contends: "On the day that Epstein entered his guilty plea in June 2008, some (but by no means all) victims were notified that the federal investigation of Epstein had concluded" citing an e-mail AUSA Villafana sent to "Jason" (full name redacted) after Epstein's State Court hearing.  Maj. Op. at 6.  There is no evidence, however, that the two petitioners here, their attorney Edwards, or other victims were told that the state plea was related to Epstein's crimes against them, much less that the state plea would foreclose the possibility of federal prosecution for Epstein's federal crimes against his victims.

82

After multiple hearings, the District Court ordered the U.S. Attorney's Office to disclose the NPA to the victims.  In August 2008, the petitioners finally obtained a copy of the NPA.  Among other relief, the victims sought rescission of the NPA.

What followed was more than a decade of contentious litigation between the victims, the U.S. Attorney's Office, Epstein, and his various defense attorneys.[13]  In 2011, the District Court "addresse[d] the threshold issue whether the CVRA attaches before the government brings formal charges against a defendant."  Does v. United States, 817 F. Supp. 2d 1337, 1341 (S.D. Fla. 2011).  In a thorough opinion, the District Court held that it does under the plain text of the CVRA.  Id. at 1341-43.  Later, on February 21, 2019, the District Court ruled that the U.S. Attorney's Office entered into the NPA without first conferring with the victims and violated the victims' CVRA rights to confer and be treated fairly.[14]  Doe 1 v. United States, 359 F. Supp. 3d 1201, 1218-22 (S.D. Fla. 2019).

After extensive briefing on remedies for the victims, Epstein was found dead on August 10, 2019.  On September 16, 2019, the District Court entered an order

---

[13]Epstein and some of his defense team intervened to argue against victims obtaining their correspondence about the negotiation and execution of the NPA.  Although the petitioners seek rescission of the NPA as to Epstein's co-conspirators, the co-conspirators never moved to intervene.

[14]In a later order, the District Court explained that the petitioners' "right to be treated with fairness and to receive notice of court proceedings . . . flow from the right to confer and were encompassed in the Court's ruling finding a violation of the CVRA."

denying the victims any remedies and closed the case. As to Epstein, the District Court determined that "there is no longer an Article III controversy" given his death. As to the co-conspirators, the District Court found it lacked jurisdiction over them.

Victim Wild filed a petition for writ of mandamus with this Court, seeking review of the District Court's order denying relief. See 18 U.S.C. § 3771(d)(3) ("If the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus. . . . In deciding such application, the court of appeals shall apply ordinary standards of appellate review.").[15]

## VIII. QUESTION PRESENTED

This appeal presents this legal question: Whether, after completing its investigation, preparing a 53-page indictment, and conferring with Epstein's defense team about a pre-charge plea, the Office violated the victims' CVRA rights by (1) not conferring with any of Epstein's victims before agreeing to the NPA, (2) intentionally and unfairly concealing the NPA from the victims, and (3) affirmatively misrepresenting the case status to the victims after the NPA was executed. The answer depends solely on the text of the CVRA, to which I turn.

---

[15]In this appeal, the Majority does not contest that: (1) our Court applies the ordinary standards of appellate review; and (2) we review de novo statutory interpretation issues and any fact findings for clear error. No party argues any fact-finding error occurred, and thus we review de novo the District Court's ruling that the victims had pre-charge CVRA rights. If the victims had pre-charge CVRA rights to confer and be treated fairly, no party disputes those rights were repeatedly violated by the U.S. Attorney's Office.

## IX.  CVRA'S STATUTORY TEXT

### A.  CVRA's Bill of Rights for Victims

In interpreting the CVRA, our Court is guided by the traditional canons of statutory construction.  "Our 'starting point' is the language of the statute itself."  EEOC v. STME, LLC, 938 F.3d 1305, 1313 (11th Cir. 2019) (quoting Harrison v. Benchmark Elecs. Huntsville, Inc., 593 F.3d 1206, 1212-14 (11th Cir. 2010)).  We "assume that Congress used the words of the statute as they are commonly and ordinarily understood and must construe the statute so each of its provisions is given full effect."  United States v. McLymont, 45 F.3d 400, 401 (11th Cir. 1995).  Therefore, "[w]e do not look at one word or term in isolation, but instead we look to the entire statutory context."  STME, 938 F.3d at 1314 (quoting Harrison, 593 F.3d at 1212).

The CVRA grants crime victims these eight rights in subsection (a):

(1) The right to be reasonably protected from the accused.

(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

85

(5) The reasonable right to confer with the attorney for the Government in the case.

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

18 U.S.C. § 3771(a) (2008) (emphasis added).  These are not merely aspirational principles.  Section 3771(c)(1) directs that "[o]fficers and employees of the Department of Justice . . . engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are . . . accorded[] the rights described in subsection (a)."  Id. § 3771(c)(1).  And if crime victims' rights are violated, the CVRA provides a procedural mechanism—this lawsuit—whereby the victims may assert their CVRA rights in federal court.  Id. § 3771(d)(3).  Undisputedly, the petitioners qualify as "crime victims" as defined in the CVRA.  See id. § 3771(e) ("[T]he term 'crime victim' means a person directly and proximately harmed as a result of the commission of a Federal offense.").

## B.  Subsections 3771(a)(5) and (a)(8)

The two subsections at issue here are (a)(5) and (a)(8), which grant crime victims "[t]he reasonable right to confer with the attorney for the Government in the case" and "[t]he right to be treated with fairness."  18 U.S.C. § 3771(a)(5), (8).  These two statutory rights are stated in plain language.  The text of the two rights

has no post-indictment temporal limitation on its face.  The language of

§ 3771(a)(5) and (a)(8) is not ambiguous, intricate, obscure, or doubtful (as the

Majority suggests).  Maj. Op. at 20 & n.8.  As enacted, Congress granted these

rights to victims of crime, and though the rights are not wholly unlimited as

discussed later, Congress did not restrict these rights to only the time after an

indictment is filed in federal court.  In interpreting a statute, when "the language at

issue has a plain and unambiguous meaning," we "need go no further."  United

States v. St. Amour, 886 F.3d 1009, 1013 (11th Cir.), cert. denied, 139 S. Ct. 205

(2018) (quoting United States v. Fisher, 289 F.3d 1329, 1337-38 (11th Cir.

2002)).[16]  Our statutory analysis thus should start and end with the language of

subsections (a)(5) and (a)(8).

The overall statutory structure of § 3771 also supports this plain text reading.

Beyond their plain language, what Congress omitted from subsections (a)(5) and

(a)(8) of § 3771, but expressly included in subsections (a)(2), (a)(3), and (a)(4), is

instructive too.  In § 3771, subsection (a)(2) grants victims the right to "notice of

any public court proceeding"; subsection (a)(3) grants victims the right "not to be

---

[16]As noted, the CVRA was enacted to protect crime victims' rights and ensure their involvement in the criminal justice process.  See Moussaoui, 483 F.3d at 234; Kenna, 435 F.3d at 1016.  In this context, a comprehensive construction of the victims' rights to confer and be treated fairly in § 3771(a)(5) and (a)(8) is fitting.  See Yates v. United States, 574 U.S. 528, __, 135 S. Ct. 1074, 1081-82 (2015) (explaining that "[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole").

excluded from any such public court proceeding"; and subsection (a)(4) grants victims the right "to be reasonably heard at any public proceeding in the district court." 18 U.S.C. § 3771(a)(2)-(4).

In stark contrast, in subsections (a)(5) and (a)(8), Congress granted victims rights to confer and be treated fairly without tying those rights to "public court proceedings" or "public proceedings in the district court." Congress's omission of the distinct phrase of "public court proceedings" in subsections (a)(5) and (a)(8) is highly significant.

First, under the conventional rules of statutory construction, where Congress has used a more limited term in one part of a statute, but left it out of other parts, courts should not imply the term where it has been excluded. See Keene Corp. v. United States, 508 U.S. 200, 208, 113 S. Ct. 2035, 2040 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983) (declining to read a term appearing in two subsections of a statute to have the same meaning where there is "differing language" in the subsections).

Second, "[a] familiar principle of statutory construction . . . is that a negative inference may be drawn from the exclusion of language from one statutory

88

provision that is included in other provisions of the same statute." Hamdan v. Rumsfeld, 548 U.S. 557, 578, 126 S. Ct. 2749, 2765 (2006); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) ("[W]here a document has used one term in one place, and a materially different term in another, the presumption is that the different term denoted a different idea.").

In other words, had Congress wanted the conferral and fairness rights to apply only after the government has filed an indictment in court, Congress could have easily written subsections (a)(5) and (a)(8) more narrowly, as it did in other parts of subsection (a). But "the presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions." Scalia & Garner, supra at 101 ("General terms are to be given their general meaning (generalia verba sunt generaliter intelligenda)."). Indeed, the § 3771(a) subsections explicitly tied to court proceedings show that when Congress wants to limit crime victims' rights to post-indictment court proceedings it knows how to do so and does so expressly. The CVRA's text draws a clear distinction between a victim's rights to confer and be treated fairly and a victim's rights to have notice of and participate in "public court proceedings," and our Court is required to enforce the statute's distinction as Congress wrote and enacted it.

89

## C.  Subsections 3771(c) and (d)

Two other CVRA subsections—§ 3771(c) and (d)—also support my conclusion that Epstein's victims had the rights to confer and be treated fairly before plea negotiations were completed.  "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  Home Depot U.S.A., Inc. v. Jackson, 587 U.S. __, __, 139 S. Ct. 1743, 1748 (2019) (quoting Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809, 109 S. Ct. 1500, 1504 (1989)).  "Ultimately, context determines meaning."  Johnson v. United States, 559 U.S. 133, 139, 130 S. Ct. 1265, 1270 (2010).  Subsections (c) and (d) not only provide context for subsection (a), but expressly refer to the rights in subsection (a).

Section 3771(c), titled "Best efforts to accord rights," instructs that the Justice Department and "other departments and agencies of the United States engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are . . . accorded[] the rights described in subsection (a)."  18 U.S.C. § 3771(c)(1) (emphasis added).  Logically, there would be no reason to mandate that federal agencies involved in crime "detection" or "investigation" see that victims are accorded their CVRA rights if those rights did not exist pre-charge.  Indeed, the use of disjunctive wording—the "or"—indicates

90

agencies that fit either description must comply, and not just, for example, the FBI, which is at times engaged in both crime investigation and prosecution.

A victim's right to conferral is with the government's attorney in the case, not with the FBI. But the fact that the FBI has a "best efforts" duty during the criminal investigation to see that a victim's conferral rights are honored is another textual signal that the victim has conferral rights pre-charge, where the case has matured to the point that a government attorney is assigned.

Lest any doubt remains, the CVRA's venue provision in § 3771(d)(3) conclusively demonstrates that the Act gives crime victims rights pre-charge. Section 3771(d)(3) provides: "The rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred." Id. § 3771(d)(3) (emphasis added).

Read most naturally, this venue provision provides that, if a prosecution is underway, victims may assert their rights in the ongoing criminal action. Id. If, however, "no prosecution is underway," victims may assert their rights in the district court of the district in which the crime occurred. Id. And if a crime victim's CVRA rights may be enforced before a prosecution is formally underway in district court, then to avoid a strained reading, those rights must attach at some point before an indictment formally charges the defendant with the crime.

91

So how does the Majority resist the plain reading of the venue provision in § 3771(d)(3)? To be fair, the Majority admits first that: "Petitioner's interpretation of subsection (d)(3) is not implausible—that provision could be read to mean that CVRA rights attach before the commencement of criminal proceedings." Maj. Op. at 33. But then the Majority argues that, after a criminal case is totally over, there is no prosecution underway and hence this venue provision is about "post-judgment" matters. Id. at 35-36. The Majority's reading of § 3771(d)(3) does not comport with how the word "underway" is ordinarily or commonly understood. In everyday parlance, if "a process, project, [or] activity," is not "underway," we generally understand that to mean it has not yet begun. Id. at 35. It is a stretch to say that when something is not "underway," it is commonly or ordinarily understood to mean that the something is completed.[17]

In addition, the Majority's interpretation of the phrase—"if no prosecution is underway"—makes no sense because a post-judgment action would logically be filed in the district court where the conviction was entered. Even the Majority

---

[17]Alternatively, the Majority argues that § 3771(d)(3)'s "no prosecution is underway" provision applies to the very narrow and specific period between the filing of a criminal complaint and levying formal charges by indictment. Maj. Op. at 33-35. But there is, of course, no such temporal limitation in the plain language of § 3771(d)(3), nor is there any indication this provision applies only to the subset of criminal proceedings involving a complaint. It is also not readily apparent why the Majority only looks to the Sixth Amendment right to counsel for its construction of "prosecution" and not also to the Sixth Amendment's speedy trial right in all criminal "prosecutions." Id. at 34. The Sixth Amendment speedy trial right "may attach before an indictment and as early as the time of arrest and holding to answer a criminal charge." United States v. Gouveia, 467 U.S. 180, 190, 104 S. Ct. 2292, 2298 (1984).

"concede[s] that this reading isn't perfectly seamless, in that it would require the victim to file her post-judgment motion 'in the district in which the crime occurred' rather than, as one might expect, in the district in which the prosecution occurred and the conviction was entered." Id. at 36 n.19.

Not "perfectly seamless" is an odd statutory interpretation. The Majority's faulty interpretation actually makes this part of the venue provision superfluous. See Corley v. United States, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566 (2009) ("[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."); Garcia v. Vanguard Car Rental USA, Inc., 540 F.3d 1242, 1247 (11th Cir. 2008) (stating under the canon against surplusage, "we strive to give effect to every word and provision in a statute when possible"). Our job is to enforce the statute as written by Congress.

In sum, the victims' two statutory rights—to confer and be treated fairly—though not unlimited, have no bright-line, post-indictment temporal restriction on their face. See 18 U.S.C. § 3771(a)(5), (8). Federal agencies and prosecutors engaged in the "detection, investigation, or prosecution" of crime "shall make their best efforts" to see that crime victims are "accorded[] the rights described in subsection (a)." See id. § 3771(c)(1). And "if no prosecution is underway," the venue provision directs victims that "[t]he rights described in subsection (a) shall

93

be asserted . . . in the district court in the district in which the crime occurred." See id. § 3771(d)(3).

## D. Majority's Flawed Statutory Analysis

So how in the holy name of plain text does the Majority add such a substantive and temporal restriction on the victims' rights to confer and be treated fairly and hold that victims have no CVRA rights until after the government files an indictment and commences proceedings? The Majority hacks away at the plain text with four tools.

First, the Majority cherry picks the meaning of "case" in § 3771(a)(5) and narrows it to mean judicial case only. Maj. Op. at 22-23. "Case," however, has long had a much broader meaning than the Majority uses. As stated in dictionary definitions, "case" is both "a circumstance or situation (as a crime) requiring investigation or action by the police or other agency" and "the matters of fact or conditions involved in a suit: a suit or action in law or equity." Case, Webster's Third New International Dictionary 345 (2002). Likewise, in Black's Law Dictionary, the term "case" can mean both "[a] civil or criminal proceeding, action, suit, or controversy at law or in equity <the parties settled the case>" and "[a] criminal investigation <the Manson case>." Case, Black's Law Dictionary 258-59 (10th ed. 2014). As shown in my factual background, everyone involved in

94

Epstein's case—from AUSA Villafana, to the Deputy Attorney General, and even Epstein's defense team—called this a "case" before an indictment was filed.

The Majority brushes aside the fact that the term "case" can mean both a judicial case and an investigative case on the basis that Black's first defines "case" as a civil or criminal proceeding and only second as a criminal investigation. Maj. Op. at 22-23.[18] But since when is statutory interpretation as simple as picking the first definition listed in a Black's dictionary entry to the exclusion of a word's ordinary meaning? The Majority cites no legal support for its "first listed dictionary definition" canon of construction.[19]

---

[18]The Majority argues: "Although it's true, at least in the abstract, that the term 'case' can mean either thing, in legal parlance the judicial-case connotation is undoubtedly primary." Maj. Op. at 22-23.

[19]As to the term "case," even the Majority cites Chavez v. Martinez, 538 U.S. 760, 766, 123 S. Ct. 1994, 2000-01 (2003), which supports my conclusion that the CVRA's conferral right attaches pre-charge. See Maj. Op. at 23. In Chavez, the Supreme Court construed the Fifth Amendment's Self-Incrimination Clause, which prohibits a person from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court concluded the phrase "criminal case" "requires the initiation of legal proceedings" and does not "encompass the entire criminal investigatory process" because a person can only be compelled to be "a witness against himself" in his own criminal prosecution. Chavez, 538 U.S. at 766, 123 S. Ct. at 2000-01. But Chavez itself points out that, for the target of a criminal case, "legal proceedings" for purposes of the Fifth Amendment privilege against self-incrimination includes pre-indictment grand jury proceedings—at which the target cannot be compelled to testify. Id. at 767-68, 123 S. Ct. at 2001. More importantly for this case, the Supreme Court clarified: "We need not decide today the precise moment when a 'criminal case' commences; it is enough to say that police questioning does not constitute a 'case' any more than a private investigator's precomplaint activities constitute a 'civil case.'" Id. at 766-77, 123 S. Ct. at 2001. Here, the CVRA conferral right is with the government's attorney in the case, not with the police or an investigator. Not only did the Office target Epstein, but it drafted an indictment and met with Epstein's defense counsel about a plea in the case. To say that mature stage is not a CVRA "case" under Chavez's reasoning is illogical.

The Majority also cites to Blyew v. United States, 80 U.S. (13 Wall.) 581, 595 (1872) for

95

Although "case" means both criminal investigation and formal criminal proceedings, it is worth noting whom the conferral right is between: the victim and the attorney for the government. That fits the petitioners' claim that once the criminal case has matured to plea negotiations by "the attorney for the Government in the case" with defense counsel, the victims had the right to know that and to confer with the government's attorney.

As its second instrument, the Majority drills down on the meaning of "the attorney for the Government" in § 3771(a)(5). The Majority argues that it means one attorney and therefore the conferral right "attaches only after proceedings have begun, at which point that particular person will presumably be more readily identifiable." Maj. Op. at 23-24. I don't quarrel with the fact that an attorney needs to be "readily identifiable," as the Majority puts it. But the Majority wrongly concludes that happens only once court proceedings begin after a formal indictment. That conclusion is divorced from reality and sorely lacking in explanation. Who does the Majority think procures an indictment—just some random attorney not assigned to the case pre-charge? Nonsense. Contrary to the Majority's presumption, specific government attorneys are routinely assigned to

---

the unremarkable proposition that the words "case" and "cause" are synonyms and can "mean[] a proceeding in court, a suit or action." Maj. Op. at 23. But if in Chavez, over 130 years after Blyew, the Supreme Court still hasn't defined the precise moment a criminal case commences, I don't see how Blyew supports the Majority's proposition that a "case" means only post-indictment proceedings.

draft indictments and handle pre-charge matters.  Once an investigation is completed, the case has matured to the indictment-drafting stage and pre-charge plea negotiations with defense counsel have begun, there is obviously a "readily identifiable" attorney in the case.

What I quarrel with is the Majority's leap from this statutory phrase to its mistaken conclusion that this phrase translates to the Majority's claimed post-indictment restriction on the conferral right.  Notably, the pre-charge period has become crucial to white-collar defense attorneys, who are hired to represent potential defendants pre-charge precisely in order to negotiate with the already assigned, readily identifiable prosecutor and extract the best plea deal in advance of any indictment.  The Majority's pre-charge rule will deny victims' CVRA rights to confer and fairness in cases involving white-collar and other wealthy defendants who commonly engage in pre-charge plea negotiations.

Jeffrey Epstein's case illustrates my point.  The U.S. Attorney's Office assigned specific attorneys, with AUSA Villafana being the lead prosecutor and primary attorney who negotiated with Epstein's defense team.  And Epstein's defense team spent days negotiating with the Office to extract the best plea deal pre-charge.  As such, there was a readily identifiable attorney—"the attorney for the Government"—for Epstein's victims to confer with even though formal court proceedings had not yet commenced.  We should take the victims' rights granted in

97

§ 3771(a)(5) and (a)(8) at face value and not restrict them to benefit the privileged few.[20]

As its third tool to axe the plain text, the Majority contends that its reading of § 3771(a)(5) and (a)(8) is supported by the canon noscitur a sociis, that is, "'a word is known by the company it keeps.'"  See S.D. Warren Co. v. Me. Bd. of Envtl. Prot., 547 U.S. 370, 378, 126 S. Ct. 1843, 1849 (2006); Maj. Op. at 25-26. Do not fall for this.  The noscitur a sociis principle is a "useful rule of construction where words are of obscure or doubtful meaning and then, but only then, its aid may be sought to remove the obscurity or doubt by reference to the associated words."  Russell Motor Car Co. v. United States, 261 U.S. 514, 520, 43 S. Ct. 428, 430 (1923).  But here, the meaning of the plain words in § 3771(a)(5) and (a)(8) is not in doubt and all other contextual clues support that meaning.  Thus, the canon cannot be invoked to defeat Congress's decision to grant crime victims these plainly-worded rights of conferral and fairness.  See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 226-27, 128 S. Ct. 831, 839-40 (2008) (rejecting the invocation of

---

[20]The Majority does not dispute that prosecutors and defense counsel routinely negotiate pre-charge plea agreements, particularly in white-collar cases.  Paul G. Cassell, et al., Crime Victims' Rights During Criminal Investigations? Applying the Crime Victims' Rights Act Before Criminal Charges Are Filed, 104 J. Crim. L. and Criminology 59, 84 (2014).  Guilty pleas, in fact, account for over 97% of all criminal convictions obtained by the government.  See U.S. Courts, Judicial Business 2019 Tables: Criminal Defendants Terminated, by Type of Disposition and Offense (Table D-4) (Sept. 30, 2019) (only 1,663 of the 78,767 defendants convicted of federal crimes in the year ending September 30, 2019, were found guilty by a judge or jury after a criminal trial; the rest pled guilty), https://www.uscourts.gov/judicial-business-2019-tables.

this canon as an "attempt to create ambiguity where the statute's text and structure suggest none").

Moreover, the cases the Majority cites for this canon involved statutes with much stronger and closer contextual clues than in § 3771(a).  See Gutierrez v. Ada, 528 U.S. 250, 254-58, 120 S. Ct. 740, 743-46 (2000) (applying the canon to narrow the phrase "any election" where it was closely surrounded by six specific references to gubernatorial elections); Lagos v. United States, 584 U.S. __, __, 138 S. Ct. 1684, 1688-89 (2018) (applying the canon to narrow the words "investigation" and "proceedings" to government investigations and criminal proceedings where the words were closely surrounded by three specific expenses victims would incur during government investigations and prosecutions, but not in private investigations and bankruptcy proceedings).

Importantly too, the three subsection (a) rights in § 3771 that refer to court or public "proceeding[s]" are rights that could not exist absent such a proceeding. A victim's right to receive "timely notice of," "not . . . be excluded from," or "be reasonably heard at" a proceeding would not attach until the time when such a proceeding would or could be held.  See 18 U.S.C. § 3771(a)(2)-(4).  Those rights are contingent on the existence of a court proceeding, of which a victim might be notified, from which a victim might be excluded, or at which a victim might be heard.  In contrast, a victim's rights to confer or be treated fairly in no way flow

99

from or presuppose ongoing court proceedings. It makes little sense to take the inherent temporal limits placed on rights explicitly tied to and dependent upon court proceedings and transfer them to rights which do not carry that particular limitation.

Although public court proceedings are mentioned in three different rights in § 3771(a)(2)-(4), and crime victims have the right to be protected from the accused in § 3771(a)(1), as well as the right to "full and timely restitution" in § 3771(a)(6), nothing in the overall statutory context suggests subsection (a) is focused exclusively on victims' rights accruing only after the filing of an indictment. See Ali, 552 U.S. at 225-26, 128 S. Ct. at 839-40 (refusing to apply the canon noscitur a sociis to narrow the phrase "any other law enforcement officer" in 28 U.S.C. § 2680(c) to the scope of the phrase that preceded it, "any officer of customs or excise," because "nothing in the overall statutory context suggests that customs and excise officers were the exclusive focus of the provision"); see also Beecham v. United States, 511 U.S. 368, 371, 114 S. Ct. 1669, 1671 (1994) (explaining that the noscitur a sociis "canon of construction is by no means a hard and fast rule"). The temporal limitations in other § 3771(a) subsections are not inconsistent in any way with the conclusion that crime victims' rights to confer and be treated fairly

"sweep[] as broadly as [the] language suggests."[21]  See Ali, 552 U.S. at 226, 128 S.

Ct. at 840.

The Majority's fourth attempted blow at the CVRA's plain text in

subsections (a)(5) and (a)(8) comes via a marred reading of the word "motion" in

subsection (d)(3).  Section 3771(d)(3) provides that a CVRA victim asserts her

subsection (a) rights in the district court by filing a "[m]otion for relief."  18 U.S.C.

§ 3771(d)(3).  Again, "if no prosecution is underway," that motion is to be filed "in

the district court in the district in which the crime occurred."  Id.  Once filed, "[t]he

district court shall take up and decide any motion asserting a victim's right

forthwith."  Id.

In considering the usage of "motion" in § 3771(d)(3), the Majority asserts

that a "motion" is solely a request filed within the context of an ongoing judicial

---

[21]Unable to find support in the CVRA's plain text, the Majority turns to language in an older victims-rights enactment—the Victims' Rights and Restitution Act of 1990 ("VRRA"). Maj. Op. at 38-41.  But the Majority fails to recognize the CVRA repealed significant parts of the VRRA because the legislation was ineffective.  See Justice for All Act of 2004, § 102(c). The CVRA's legislative history refers to earlier unsuccessful victims' litigation under the VRRA and cautions that "[i]t is not the intent of this bill that its significance be whittled down or marginalized by the courts or the executive branch.  [The CVRA] . . . is meant to correct, not continue, the legacy of the poor treatment of crime victims in the criminal [justice] process." 150 Cong. Rec. S4269 (daily ed. Apr. 22, 2004) (statement of Sen. Feinstein).

In any event, the VRRA did not contain any "right to confer," or a "right to be treated with fairness," and thus it does not provide guidance for construing the CVRA's conferral and fairness rights here.  More still, as the Majority hints at, had Congress wanted to limit the CVRA's conferral and fairness rights to certain stages of a criminal case, it could have simply drafted the legislation more narrowly and tied those rights to "charges," "trial[s]," "hearing[s], and "proceedings" like it did with different rights in the VRRA.  See Maj. Op. at 39-40.  When Congress wants to limit victims-rights protections to only certain stages of a criminal case, it knows how to do so.

101

proceeding.  Maj. Op. at 27-28.  The Majority argues that, since CVRA rights can only be asserted in a "mid-proceeding 'motion[],'" the CVRA's protections apply only after court proceedings have started.  See id. at 28.

As with "case," the Majority slices in half the definition of the word "motion."  The common legal definition of "motion" is more general and broader: a motion is "[a] written or oral application requesting a court to make a specified ruling or order."  Motion, Black's, supra, at 1168.  This general definition encompasses a motion initiating a new lawsuit or proceeding, as well as one filed mid-proceeding.  In fact, the federal rules and statutes allow quite a few motions to initiate new proceedings in the district court, such as motions to quash grand jury and other subpoenas, Fed. R. Crim. P. 17(c)(2), and motions to vacate, set aside, or correct sentences, 28 U.S.C. § 2255.  See also 28 U.S.C. § 1361 (mandamus proceedings are initiated as a new lawsuit).  This very case is a free-standing civil action litigated for a decade because the CVRA expressly provides that "if no prosecution is underway," the "[m]otion for relief" is filed "in the district court in the district in which the crime occurred."  18 U.S.C. § 3771(d)(3).  If anything, § 3771(d)(3) demonstrates that the Majority has added a very substantive

restriction—victims have no CVRA rights until an indictment commences court proceedings—that has no meaningful footing in the text of the statute.[22]

### E. In re Dean, 527 F.3d 391 (5th Cir. 2008)

The only other circuit court to address this precise issue has come to the same conclusion as I do.  The Fifth Circuit has held: "'[T]here are clearly rights under the CVRA that apply before any prosecution is underway.' . . . Logically, this includes the CVRA's establishment of victims' 'reasonable right to confer with the attorney for the Government.'  18 U.S.C. § 3771(a)(5)."  In re Dean, 527 F.3d at 394.  The facts of In re Dean are instructive too.

After an explosion at a refinery owned and operated by BP Products North America Inc. ("BP") killed 15 people and injured more than 170, the Department of Justice investigated and decided to bring federal charges against BP.  Id. at 392-93.  Before filing them, the government negotiated a plea deal with BP.  Id. at 392.  At the government's request, the district court entered an ex parte order that prohibited the government from notifying the victims of a potential plea agreement until after one was executed.  Id. at 392-93.  Later, the government and BP signed a plea agreement without the government's attorneys conferring with the victims.  Id. at 393, 395.

---

[22]Let's be clear: If the Majority's view holds, this civil case should have been dismissed at its very inception because the Office never filed a formal indictment.

The Fifth Circuit concluded that the government violated the victims' right to confer under § 3771(a)(5) by executing the plea agreement without informing the victims of the likelihood of the criminal charges and learning the victims' views on the possible details of the plea bargain.  Id. at 394.

Here, similar to the posture in In re Dean, the U.S. Attorney's Office investigated Epstein's sex-trafficking crimes, decided to bring federal charges against him, and engaged in pre-indictment plea negotiations with Epstein's defense team.  The Office and Epstein then executed an NPA, extending immunity to Epstein and his co-conspirators, without ever conferring with Epstein's victims in violation of § 3771(a)(5).  What's worse, here, the Office deliberately concealed the NPA's existence and misled the victims to believe that federal prosecution was still a possibility, telling them to be "patient" while the investigation proceeded.

The Majority heavily criticizes the Fifth Circuit's In re Dean for merely "echo[ing]" the Texas district court's conclusion that "[t]here are clearly rights under the CVRA that apply before any prosecution is underway" and as lacking discussion of the CVRA's text, history, or structure.  Maj. Op. at 49-50 n.25.  What the Majority leaves out is that the Texas district court's decision—echoed by the Fifth Circuit—contains a thorough examination of the CVRA's text, history, and structure, which led it to conclude that § 3771(a)(5)'s right to confer and § 3771(c)'s related notice obligation apply to the period before a charging

104

instrument is filed.  See United States v. BP Prods. N. Am. Inc., No. H-07-433, 2008 WL 501321 at *11-15 (S.D. Tex. Feb. 21, 2008).  We should join our Fifth Circuit sister.

## F.  Majority's Slippery Slopes and Policy Arguments

The Majority invokes a parade of horribles—"a jarring result"—that it believes would follow if (1) the CVRA was interpreted to grant crime victims the right to confer with the government's attorney before an indictment is filed and (2) courts were "[f]reed from any line limiting the Act's applicability" to post-charge court proceedings.  Maj. Op. at 31, 47.  The Majority suggests that interpreting § 3771(d)(3)'s "no prosecution is underway" clause to mean that CVRA rights attach pre-charge would open the floodgates to victim lawsuits seeking to make prosecutors consult with victims before "law-enforcement officers conduct a raid, seek a warrant, or conduct an interrogation[.]"  Id. at 36.  The Majority also posits that interpreting the CVRA to grant rights during the "investigation" of a crime would "require law-enforcement officers to 'confer' with victims . . . before conducting a raid, seeking a warrant, making an arrest, interviewing a witness, convening a lineup, or conducting an interrogation."  Id. at 31.

Like all slippery slope arguments, the soundness of the Majority's position depends on "an empirical prediction that a proposed rule will increase the

likelihood of some other undesired outcome occurring."  See B.H. ex rel. Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 317 (3d Cir. 2013); Frederick Schauer, Slippery Slopes, 99 Harv. L. Rev. 361, 381 (1985) ("[A] persuasive slippery slope argument depends for its persuasiveness on temporally and spatially contingent empirical facts," and "without empirical evidence" of an underlying reality, "the slippery slope argument has nothing on which to stand.").  Yet, the Majority offers no empirical basis for its slippery slope arguments or its professed need to add, by judicial fiat, a bright-line, post-indictment restriction on the CVRA's plain text.

What's more, the actual facts show the Majority's feared hypotheticals are pure conjecture.  For 12 years, it's been the rule in the Fifth Circuit that crime victims have the right to confer with the government's attorney before formal criminal proceedings have commenced.  Yet there is no evidence whatsoever that federal prosecutors in Texas, Louisiana, and Mississippi must confer with crime victims before law-enforcement officers "conduct[] a raid, seek[] a warrant, mak[e] an arrest, interview[] a witness, conven[e] a lineup, or conduct[] an interrogation." And in the nine years since the District Court's 2011 opinion in this case—also holding that crime victims have the right to confer with government's attorney pre-charge—we haven't seen reports that federal prosecutors in the Southern District

106

of Florida are conferring with victims before law enforcement conducts a raid or convenes a lineup, for example. The Majority's misgivings are illusions.

## G. Limiting Principles in the CVRA

Besides lacking empirical plausibility, the Majority's feared hypotheticals are legally implausible and ignore several limiting criteria contained in the text of the CVRA itself. In this regard, here are the Majority's stated worries: (1) if a victim's rights can attach pre-charge, then there is "no logical stopping point" and no "limiting criterion," see Maj. Op. at 36, 52; (2) "there is essentially no limit to the sorts of pre-charge relief that an enterprising movant [victim] could seek—or that an innovative judge might grant," see id at 48 n.24; and (3) if crime victims have rights pre-charge, then courts would intrude on prosecutorial discretion because: "Freed from any line limiting the Act's applicability to the post-charge phases of a prosecution, courts would be empowered to issue injunctions requiring (for instance) consultation with victims before raids, warrant applications, arrests, witness interviews, lineups, and interrogations," see id. at 47.

While the Majority scrutinizes the text of § 3771(c)(1) and (d)(3) for its limiting principle and finds none for subsection (a)(5)'s conferral right, it conspicuously overlooks the text of the conferral right itself, which contains powerful limiting criteria. First, § 3771(a)(5)'s conferral right is with "the attorney for the Government in the case," not with police or investigators. That alone

107

resolves some of the Majority's slippery slope concerns because the CVRA does not give crime victims the right to confer with anyone other than the government's attorney.

Second, and relatedly, as the Majority concedes, § 3771(a)(5)'s conferral right presupposes that a "readily identifiable" attorney for the government has been assigned to the case.  As even the Majority recognizes, that also means the case has matured beyond the police investigative stage before the right applies.

Third, § 3771(a)(5) grants crime victims the right to confer with the government's attorney, but only to the extent that conferral is "reasonable."  The Majority summarily discards this reasonableness limitation as "squishy."  Maj. Op. at 31.  Yet, a victim's "reasonable right to confer" is a forceful limiting principle and embodies a common, workable legal standard that is sufficient to stave off the Majority's speculations about "enterprising" crime victims and "innovative" judges.  Reasonableness has long stood the test of time in limiting other actors' conduct.  See, e.g., Hardy v. Cross, 565 U.S. 65, 69-70, 132 S. Ct. 490, 493-94 (2011) (for purposes of the Sixth Amendment's Confrontation Clause, the "lengths to which the prosecution must go to produce a witness" is a "question of reasonableness"); United States v. Banks, 540 U.S. 31, 35-36, 124 S. Ct. 521, 524-25 (2003) (for purposes of the Fourth Amendment, the execution of a warrant is subject to a reasonableness standard); Ohio v. Robinette, 519 U.S. 33, 39, 117 S.

Ct. 417, 421 (1996) ("We have long held that the 'touchstone of the Fourth Amendment is reasonableness.'"); Kyles v. Whitley, 514 U.S. 419, 432-33, 115 S. Ct. 1555, 1565 (1995) (under the Due Process Clause and Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), prosecutors must disclose all evidence, upon request, that is favorable to the defense, so long as the evidence is "material," meaning it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed); Doggett v. United States, 505 U.S. 647, 651, 654, 656, 112 S. Ct. 2686, 2690, 2692-93 (1992) (in determining whether the government violated a defendant's Sixth Amendment speedy trial right, courts must consider, inter alia, whether any delays attributable to the prosecution were reasonable); Thornburgh v. Abbott, 490 U.S. 401, 413, 109 S. Ct. 1874, 1881 (1989) (prison regulations affecting the sending of publications to prisoners must be analyzed under a reasonableness standard); Strickland v. Washington, 466 U.S. 668, 688, 104 S. Ct. 2052, 2065 (1984) ("The proper measure of attorney performance" under the Sixth Amendment "remains simply reasonableness under prevailing professional norms.").

Looking beyond the text of § 3771(a)(5), the conferral right is also subject to the CVRA's express mandate that nothing in the Act "shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6). Likewise, only a "crime victim" has the

conferral right, which limits the right to a person "directly and proximately harmed as a result of the commission of a Federal offense." Id. § 3771(e). Taken together, these statutory provisions bound the conferral right, such that the Majority's trepidations are too far-fetched to justify disregarding the CVRA's plain text. The Majority does not cite a single factual incident or judicial decision where its apprehensions have become reality. Despite its best efforts, the Majority has identified no reason to contravene the CVRA's plain text as Congress enacted it.

Because the Majority's blanket restriction denies victims all conferral rights during the pre-charge period, the Majority admits that its rule "will not prevent federal prosecutors from negotiating 'secret' plea and non-prosecution agreements" pre-charge. Maj. Op. at 52. In light of the public outcry about the Epstein case, the Majority says it "can only hope" that prosecutors "will not do so." Id. at 52-53. Let's distill this further. The Majority is more afraid of a future "crime victim" potentially asking a "readily identifiable" government "attorney" to confer "reasonably" with her pre-charge, than it is of secret pre-charge plea deals for wealthy defendants, even though it's now common practice for them to seek the best plea deal in advance of indictment. The Majority's new blanket restriction eviscerates crime victims' CVRA rights and makes the Epstein case a poster-child for an entirely different justice system for crime victims of wealthy defendants.

110

Rather than rewriting the CVRA to protect against so-called "enterprising" victims and "innovative" judges, this Court should: (1) recognize that the CVRA's text already contains powerful limiting principles—"a reasonable right to confer" only "with the attorney for the Government in the case," granted only to defined "crime victims" and without impairment of prosecutorial discretion; (2) enforce the plain text of § 3771(a)(5) and (a)(8) in this case; (3) hold that the Office's prosecutor in the case had an obligation to confer with Epstein's victims, given the investigation was completed, the 53-page indictment was drafted, and the prosecutor was already conducting pre-charge plea negotiations with Epstein's defense team; and (4) conclude that the Office violated the victims' right to be treated fairly by not disclosing the signed NPA before the State Court hearing and by misrepresenting the case status to the victims.

## H.  Concurring Opinion

Now, my brief response to my colleague's Concurring Opinion.  His Opinion submits that "the Executive Branch has exclusive power over prosecutorial decisions" and that "authority obviously includes the decision . . . whether to seek, or not seek, an indictment from the grand jury," both propositions with which I wholeheartedly agree.  Conc. Op. at 54-55.

The Concurring Opinion contends, however, that "the model the dissent creates"—requiring the U.S. Attorney's Office to confer with a victim about a

111

criminal matter prior to indictment—(1) "raises serious questions about whether, by doing so, the judiciary would be violating the constitutional principle of separation of powers," and (2) "would clearly interfere with the Executive Branch's investigative and prosecutorial functions." Id. at 54, 56. The Concurring Opinion further states: "The notion that a district court could have any input on a U.S. Attorney's investigation and decision whether to bring a case to the grand jury is entirely incompatible with the constitutional assignment to the Executive Branch of exclusive power over prosecutorial decisions." Id. at 57. The Opinion concludes, therefore, that "the CVRA is best understood as not applying until charges are commenced against a defendant" because "such an interpretation avoids raising serious constitutional questions." Id. at 59.

This Concurring Opinion is helpful because it highlights what is and what is not the issue in this appeal. First, nothing in the CVRA as Congress wrote it permits the district court to suggest to a U.S. Attorney any investigation or grand jury steps that he must take. The CVRA requirement is only that the prosecutor speak with the victim before making a final indictment decision. If a U.S. Attorney, after reasonably conferring with the victim, decides not to take the case to the grand jury, there will be no CVRA violation for the district court to remedy, and thus no "meddling in the Executive Branch's" exclusive powers under the Constitution. See id. at 58.

112

Happily enough, my plain reading of the statute in no way injects judicial interference into a prosecutor's decisions. In fact, not even the victims here claim they have any authority over a prosecutor's decision as to who to indict or not indict, or for what crime. The victims' bare-bones claim is only that the CVRA required a prosecutor in the Office to confer with them before making those weighty and final decisions. The fact that a prosecutor must confer with a victim pre-charge does not mean the district court can exercise any control over the prosecutor's ultimate decision whether to indict.

Here, after drafting a 53-page indictment, the U.S. Attorney's Office spent not hours, but days conferring pre-charge with Epstein's defense team. All the CVRA does is obligate the prosecutor to give the victims a reasonable opportunity to confer with them too. This is no impairment whatsoever on the prosecutor's authority to decide whether to indict or not. The CVRA even expressly mandates that nothing in the Act "shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6).

At oral argument in this appeal, counsel arguing for the respondent U.S. Attorney's Office agreed the constitutionality of the CVRA was not being challenged. With all due respect, this constitutional separation-of-powers concern is a red herring.

Also, the canon of constitutional avoidance does not apply here because the CVRA is plain and unambiguous.  See United States v. Stevens, 559 U.S. 460, 481, 130 S. Ct. 1577, 1591-92 (2010) (providing that courts cannot "rely upon the canon of construction that 'ambiguous statutory language [should] be construed to avoid serious constitutional doubts'" unless the statute is first ambiguous).  As the Supreme Court recently explained, "[s]potting a constitutional issue does not give a court the authority to rewrite a statute as it pleases."  Jennings v. Rodriguez, 538 U.S. __, __ 138 S. Ct. 830, 843-44 (2018) (declining to apply the canon of constitutional avoidance because the statutory language at issue was not ambiguous).  Instead, constitutional avoidance serves the "basic democratic function of maintaining a set of statutes that reflect, rather than distort, the policy choices that elected representatives have made."  Almendarez-Torres v. United States, 523 U.S. 224, 237-38, 118 S. Ct. 1219, 1277-28 (1998).  To that end, the Supreme Court has cautioned that, "rewrit[ing] a law to conform it to constitutional requirements  . . . would constitute a serious invasion of the legislative domain."  Stevens, 559 U.S. at 481, 130 S. Ct. at 1592.

Another observation.  The Concurring Opinion insists the problems it identifies would not exist post-charge because, in that case, the district court would not be "imposing a condition upon his prosecutorial discretion."  Conc. Op. at 57-58.  But a government attorney makes all sorts of discretionary prosecutorial

114

decisions following an indictment, chief among them whether to enter into a plea agreement with the accused and potentially dismiss some or all of the charges. Thus, to the extent the Concurring Opinion perceives separation-of-powers issues with a district court ordering the government's attorney merely to confer with victims about prosecutorial discretionary decisions, it is not clear why the Majority's post-indictment restriction avoids those issues, given the victims can complain about lack of conferral following an indictment too.

In any event, the Concurring Opinion usefully illustrates the importance of the CVRA's mandate in § 3771(d)(6)—nothing in the Act "shall be construed to impair . . . prosecutorial discretion"—as yet another forceful limiting principle in the CVRA text that alleviates any need for the Majority to transplant its very substantive and temporal restriction on top of the plain text of § 3771(a)(5) and (a)(8).

## X.  REMEDY

To remedy the Office's proven CVRA violations, the victims proposed the following: (1) an order scheduling a public hearing in the Southern District of Florida in which the victims could participate and present victim-impact statements to the District Court; (2) discovery of records regarding law-enforcement's investigation of the crimes against the victims; (3) discovery of records explicating why the U.S. Attorney's Office decided to grant Epstein federal immunity; (4) the

Department of Justice's designation of a representative to explain the Office's decision to resolve the Epstein case without any federal prosecution; (5) mandatory CVRA training for criminal prosecutors in the Office; (6) a requirement that the Office use its best efforts to provide victims (who request it) accurate and timely notice of future case events regarding Epstein's crimes; and (7) sanctions, attorney's fees, and restitution.

Yet before the District Court ruled on the remedies, Epstein died on August 10, 2019. On September 16, 2019, the District Court directed the Clerk to "close the case and all pending motions are denied as moot." Because the Office could no longer prosecute the intervenor Epstein, the victims' additional remedy requests—such as rescission of the NPA as to him—were clearly moot. However, as the victim petitioner argues before us, this civil case remains live as between the victims and the Office with respect to the victims' other requested remedies.

Accordingly, I would remand this case to the District Court to fashion a remedy for the proven CVRA violations. Federal courts have had broad authority to fashion equitable remedies after petitioners have proven a violation of statutory provisions. Hardison v. Cohen, 375 F.3d 1262, 1266 (11th Cir. 2004); Nichols v. Hopper, 173 F.3d 820, 824 (11th Cir. 1999); Ala. Hosp. Ass'n v. Beasley, 702 F.2d 955, 962 (11th Cir. 1983) (in light of statutory violation, we "accordingly remand to the district court so that it may devise an appropriate equitable remedy").

116

Furthermore, it has long been an "indisputable rule, that where there is a legal right, there is also a legal remedy." Marbury v. Madison, 5 U.S. 137, 163 (1803) (quoting 3 William Blackstone, Commentaries *23).  For that reason, "[w]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." Franklin v. Gwinnett Cty. Pub. Sch., 503 U.S. 60, 66, 68-69, 112 S. Ct. 1028, 1033-34 (1992) (rejecting government's argument that courts have abandoned the general rule that all appropriate relief is available to vindicate a federal right); Bruschi v. Brown, 876 F.2d 1526, 1531 (11th Cir. 1989) (taking "special note" the Supreme Court has made clear that "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant necessary relief").[23]

In closing the case, the District Court did mention that there had been an Epstein-related hearing in New York on August 27, 2019, but that was held after the remedy briefing here was completed.  That hearing, scheduled on six days' notice, involved potential prosecution in New York for crimes in New York—not those in Florida.  There is no evidence, and the District Court made no factual

---

[23]In the remedy briefing, the Office did not appear to oppose the District Court's ordering a public hearing in Florida in this case, at which the victims could make victim impact statements—an equitable remedy well within the District Court's discretion.  The District Court could preside over the public hearing in a manner similar to the way district courts handle victim impact statements in the context of a criminal sentencing.

117

findings, about what transpired at the New York hearing.  The Office's claim on appeal that the New York hearing was a sufficient remedy for its CVRA violations wholly lacks merit.[24]

Epstein's death also heightened the need for the District Court to carefully examine the victims' remedy request for document disclosure.  Early on, the District Court denied certain document requests based on attorney-client privilege.  Subsequently, in the course of the litigation, the U.S. Attorney's Office made numerous representations about its deliberations, both internally and externally with Epstein's attorneys, including a detailed affidavit from a line prosecutor purporting to describe those deliberations.  Thereafter, the victims filed motions claiming that the Office had waived, in whole or in part, the work-product privilege given what the Office itself had now filed and how the Office sought to defend its conduct in this case.  The District Court never made a waiver ruling, or any document-by-document findings, as to this remedy request.  If anything, the informational remedies sought by the victims have enhanced importance now.  Mysteries still exist about how Epstein and his co-conspirators escaped federal

---

[24]In closing the case as moot in light of Epstein's death, the District Court sua sponte concluded the co-conspirators had become necessary and indispensable parties and their participation as parties was now needed to afford the victims any relief.  Prior to Epstein's death, no one contended that the victims needed to join the co-conspirators as indispensable parties to this action.  Because the District Court did not afford the victims notice and at least an opportunity to consider whether to move to join the four named co-conspirators, the petitioner victim asks for a remand on this remedy issue too.

prosecution for multiple sex-trafficking crimes against over 30 minor girls in Florida.[25]

## XI.  CONCLUSION

While the Majority laments how the national media fell short on the Jeffrey Epstein story, this case is about how the U.S. prosecutors fell short on Epstein's evil crimes.  See Maj. Op. at 6.  Our criminal justice system should safeguard children from sexual exploitation by criminal predators, not re-victimize them. The Majority concludes that our Court is constrained to leave the victims "emptyhanded," and it is up to Congress to "amend the Act to make its intent clear."  Id. at 19, 52.  Not true.  The empty result here is only because our Court refuses to enforce a federal statute as Congress wrote it.  The CVRA is not as impotent as the Majority now rewrites it to be.

Given the undisputed facts that the U.S. Attorney's Office completed its investigation, drafted a 53-page indictment, and negotiated for days with Epstein's defense team, the Office egregiously violated federal law and the victims' rights by (1) not conferring one minute with them (or their counsel) before striking the final NPA deal granting federal immunity to Epstein and his co-conspirators,

---

[25]In closing the case as to the victims' request for attorney's fees, the District Court did not cite the Hyde Amendment or any legal standard.  See Hyde Amendment, Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes).  Some of the requested documents would shed further light on that issue.  This is only to say these are potential remedies that are not moot, which the District Court should first explore further.

119

(2) intentionally and unfairly concealing the NPA from the victims, as well as how the upcoming State Court plea hearing would directly affect them, and (3) affirmatively misrepresenting the status of the case to the victims after the NPA was executed. I would remand for the District Court to fashion a remedy.

For all of these reasons, I respectfully dissent from the Majority's (1) decision that the crime victims of Epstein and his co-conspirators had no statutory rights whatsoever under the Crime Victims' Rights Act, and (2) denial of the victims' petition in this case as a matter of law.